# 14-1309-cv

## United States Court of Appeals

*for the*

## Second Circuit

ROBERT CROCITTO, Derivatively on behalf of Facebook, Inc.,

*Plaintiff-Appellant*,

– v. –

MARK E. ZUCKERBERG, JAMES W. BREYER, PETER A. THIEL,
MARC L. ANDREESSEN, ERSKINE B. BOWLES,
DONALD E. GRAHAM, REED HASTINGS,

*Defendants-Appellees*,

FACEBOOK, INC.,

*Nominal Defendant-Appellee*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPENING BRIEF FOR PLAINTIFF-APPELLANT

GLANCY BINKOW & GOLDBERG LLP
122 East 42nd Street, Suite 2920
New York, New York 10168
(212) 682-5340

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

SUBJECT MATTER AND APPELLATE JURISDICTION...................................1

STATEMENT OF ISSUES PRESENTED.................................................1

STATEMENT OF THE CASE......................................................................2

   1.  Relevant Factual History .................................................................2

   2.  Relevant Procedural History.............................................................4

SUMMARY OF THE ARGUMENT ...............................................................6

STANDARD OF REVIEW ..............................................................................7

ARGUMENT ....................................................................................................7

   I.  THE DISTRICT COURT ERRED IN RULING THAT
      DEMAND FUTILITY WAS NOT ADEQUATELY PLED ............................................7

     A.  Standard For Alleging Demand Futility Under Delaware Law ...................8

     B.  Under Either The *Aronson* or *Rales* Test, Demand Is Excused .................10

  II.  THE DISTRICT COURT ERRED WHEN IT RULED THAT OWNERSHIP OF
      SHARESPOST UNITS DID NOT CONFER A BENEFICIAL OWNERSHIP IN
      FACEBOOK ...............................................................................................19

     A.  The District Court Erroneously Applied A Heightened Pleading Standard
        To Determine That Plaintiff Did Not Adequately Plead Contemporaneous
        Stock Ownership ......................................................................................19

     B.  The District Court Erred When It Ruled Purchases Of Units Through
        SharesPost Did Not Confer Equitable Ownership Of Facebook Stock ......21

i

III.  THE DISTRICT COURT ERRED WHEN IT RULED THAT THE CLAIMS
ALLEGED IN THE DERIVATIVE ACTIONS WERE NOT RIPE ............................25

A.  The District Court Improperly Conflated A Prudential
Standing Test Into A Constitutional Standing Analysis ............................25

B.  Mr. Crocitto's Derivative Claims Are Constitutionally Ripe ....................28

CONCLUSION ..................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Statutes and Rules</u>

Fed. R. Civ. P. 12(b)(6)................................................................7

Fed. R. Civ. P. 23.1 ................................................... 19, 20, 21

## <u>Cases</u>

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ................................. 8, 9, 10, 11

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
   845 A.2d 1040 (Del. 2004) .....................................11

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ................................. 8, 9, 12

*Bryceland v. Minogue*,
   ___ Fed. Appx. ___, 2014 WL 2579298 (1st Cir. June 10, 2014) ................ 9, 18

*Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007).............................................16

*FLI Deep Marine LLC v. McKim*,
   C.A. No. 4138-VCN, 2009 WL 1204363 (Del. Ch. Apr. 21, 2009) .....................8

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003) ............................................16

*Halebian v. Berv,*
   590 F.3d 195 (2d Cir. 2009) ..............................................7

*In re Abbott Labs. Deriv. S'holders Litig.*,
   325 F.3d 795 (7th Cir. 2003) ...............................................9

*In re Accuray, Inc. S'holder Deriv. Litig.*,
   757 F. Supp. 2d. 919 (N.D. Cal. 2010)..................................................21

*In re Baster Int'l S'holders Litig.*,
   654 A.2d 1268 (Del. Ch. 1995) ..........................................................10

*In re Cendant Corp. Deriv. Action Litig.*,
   189 F.R.D. 117, 1999 U.S. Dist. LEXIS 17472 (D.N.J. 1999) ...........................29

*In re Facebook, Inc., IPO Securities and Derivative Litigation,*
*("Derivative Opinion I")*,
   MDL No. 12-2389, 922 F. Supp. 2d 445 (Feb. 13, 2013)........................... *passim*

*In re Facebook, Inc., IPO Securities and Derivative Litigation,*
*("Derivative Opinion II")*,
   MDL No. 12-2389, 2013 WL 6798160 (Dec. 23, 2013)............................ *passim*

*In re Massey Energy Co.*,
   C.A. No. 5430-VCS, 2011 WL 2176479 (Del. Ch. May 31, 2011)....................16

*In re MAXXAM, Inc./Federated Dev. S'holders Litig.*,
   698 A.2d 949 (Del. Ch. 1996) ............................................................22

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,*
   725 F.3d 65 (2d Cir. 2013) .......................................................... 25, 28

*In re New Valley Corp. Deriv. Litig*,
   2004 WL 1700530 (Del Ch. Jun. 28, 2004) ............................................25

*In re Pennington v. Neukomm*,
   Civ. A. 4172, 1973 WL 463 (Del. Ch. Oct. 3, 1973),
   *aff'd*, 344 A.2d 386 (Del. 1975) .......................................................22

*In re Pfizer Inc. S'holder Deriv. Litig.*,
   722 F. Supp. 2d 453 (S.D.N.Y. 2010) ............................................... 8, 13

*In re RasterOps Corp. Sec. Litig.*,
   1993 U.S. Dist. LEXIS 21504 (N.D. Cal. Sept. 9, 1993) .............................. 29, 30

*In re Verisign, Inc. Deriv. Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ................................................................10

*Jones v. Taylor*,
   348 A.2d 188 (Del. Ch. 1975) ..................................................................... 22, 24

*Lambrecht v. O'Neal*,
   3 A.3d 277 (Del. 2010) ..............................................................................8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................26

*Metcalf v. Zoullas*,
   No. 11 Civ. 3996 (AKH), 2012 WL 169874 (S.D.N.Y. Jan. 19, 2012) ..............20

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
   854 A.2d 121 (Del. Ch. 2004) ...................................................................16

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726, 118 S.Ct. 1665 (1998) ..........................................................26

*Pennington v. Neukomm*,
   1973 WL 463 (Del. Ch. Oct. 3, 1973),
   *aff'd*, 344 A.2d 386 (Del. 1975) ...............................................................24

*Plymouth County Ret. Ass'n v. Schroeder*,
   576 F. Supp. 2d 360, 374 (E.D.N.Y. 2008) ..................................................20

*Pogostin v. Rice*,
   480 A.2d 619 (Del. 1984) .........................................................................12

*Rales v Blasband*,
   634 A.2d 927 (Del. 1993) ..................................................................... 9, 10

*Rosenthal v. Burry Biscuit Corp.*,
   60 A.2d 106 (Del. Ch. 1948) ....................................................................22

*Ryan v. Gifford*,
   918 A.2d 341 (Del. Ch. 2007) ...................................................................10

*Scalisi v. Fund Asset Mgmt., L.P.*,
  380 F.3d 133 (2d Cir. 2004) ...............................................................7

*Siegman v. Tri-Star Pictures, Inc.*,
  1989 WL 48746 (Del. Ch. May 30, 1989).........................................15

*Simmonds v. INS*,
  326 F.3d 351(2d Cir. 2003) ...............................................................28

*Sonkin v. Barker*,
  670 F. Supp. 249 (S.D. Ind. 1987).....................................................29

*United States v. Fell*,
  360 F.3d 135 (2d Cir. 2004) ...............................................................27

*Wood v. Baum*,
  953 A.2d 136 (Del 2008) .....................................................................9

*Zenith Radio Corp. v. Hazeltine Research, Inc*.
  395 U.S. 100 (1969)...........................................................................26

## SUBJECT MATTER AND APPELLATE JURISDICTION

This is an appeal from a final judgment.  Judge Robert W. Sweet of the Southern District of New York (the "District Court") issued substantive opinions in two other related cases, which are currently on appeal with this Circuit. The parties, recognizing the District Court's rulings would apply with equal force to Mr. Crocitto's Amended Complaint (which contains substantially similar allegations to the dismissed complaints), agreed to dismissal for purposes of judicial economy, and filed a stipulation with the District Court to that effect.  The District Court so ordered the stipulation, stating that "the Crocitto Amended Complaint is dismissed on the grounds set forth in" the other opinions, and accordingly entered a judgment dismissing Appellant's action.

## STATEMENT OF ISSUES PRESENTED

1. Did the District Court err when it ruled, in the Derivative Opinions (defined below), that the plaintiffs in question failed to plead that a majority of Facebook's directors were not independent or disinterested so as to excuse their failure to satisfy demand, when certain directors reaped billions of dollars in illicit proceeds from the IPO, other directors approved a course of action that resulted in substantial liability for Facebook, and other directors are beholden to Defendant Zuckerberg?

2. Did the District Court, in dismissing *Jones v. Andreessen*, 13cv2830, for lack of

1

standing, err when it ruled that ownership of SharesPost Units, which automatically converted to Facebook common shares after the IPO with no further action required by the holder, did not confer a beneficial ownership in Facebook, and this ?

3. Did the District Court err when it ruled that the claims against director defendants were not ripe, when significant damages had already been incurred?

## STATEMENT OF THE CASE

**1.    Relevant Factual History**

This shareholder derivative litigation concerns the Board of Directors' conduct during Facebook's initial public offering ("IPO") in 2012. During the first few months of 2012, Facebook employees and underwriters involved in the IPO went on a "roadshow" whereby they had a series of meetings with potential investors. Amended Complaint, ("AC") at ¶ 33 [A-152].[1] During these roadshows, no Facebook employee ever publicly issued any earnings guidance. *Id.* On May 3, 2012, Facebook filed an amended Form S-1 indicating a maximum offering price of $35 per share and 388 million shares to be sold in the IPO. *Id.* at ¶ 32 [A-152].

On May 9, 2012, Facebook issued an amended Form S-1 in which it expressed caution about revenue growth due to a rapid shift by users to mobile devices (mobile advertising is generally less lucrative than advertising on desktop

---

[1] [A-___] refers to citations to the Joint Appendix.

2

computers).  *Id*. at ¶ 38 [A-153].  No specific earnings guidance was included.  On May 15, 2012, General Motors ("GM") announced that it was pulling its advertising business from Facebook, stating that Facebook ads were less effective than other forms of advertising.  This move by GM cost Facebook at least $10 million in annual revenue. *Id*. at ¶ 41 [A-154].  Despite this negative news, that same day, Facebook raised its expected IPO price to $34-38 per share, from $28-35 per share.  Facebook also increased the number of shares in the IPO from 388 million to 484.4 million shares. *Id*. at ¶ 42 [A-154].

On May 18, 2012, Facebook conducted its IPO at a price of $38 per share. *Id.* at¶ 45 [A-155].  Soon after, the investing public learned that Facebook, through its executives, had selectively and verbally disseminated material to its underwriters, who shared such information with select institutional investors, including that Facebook was lowering its previously-announced guidance.  This information, however, was not publicly disseminated to other IPO purchasers.  *Id*. at ¶ 2 [A-144].

Facebook potentially violated a number of securities laws and financial regulations.   *Id*. at ¶ 46 [A-155]. As a result, many of the Appellees are named in a federal securities class action which has survived a motion to dismiss.  *Id*. at ¶ 4 [A-144-45].

## 2.    Relevant Procedural History

Appellant Robert Crocitto, a shareholder in Facebook Inc., brought a shareholder derivative action against Facebook's board members, alleging breaches of the directors' duties in connection with the Facebook IPO.[2]   Mr. Crocitto's action has similar factual and legal allegations to previous actions before Judge Sweet that were dismissed by the Derivative Opinions.  On February 13, 2013, the District Court dismissed claims in several shareholder derivative actions[3] on the following grounds: (1) those plaintiffs, who were shareholders who purchased common stock on or around the IPO, did not have standing to sue because the conduct at issue occurred before plaintiffs became purchasers of the stock; (2) those plaintiffs had not adequately pled demand futility because they failed to show that a majority of Facebook's directors were not disinterested and independent so as to excuse their failure to satisfy demand; and (3) those plaintiffs'

---

[2] Mr. Crocitto purchased Facebook shares through the purchase of Series 2 Membership Units of SharesPost Private Investments II, LLC on March 4, 2011 and May 25, 2011.  The Series 2 Membership Units converted into Class B Common Stock of Facebook after the IPO.  AC ¶ 10.  [A-146]

[3] These actions include *Childs v. Zuckerberg*, 12cv4156 (filed in the S.D.N.Y. on May 24, 2012); *Cole v. Zuckerberg*, 12cv7549 (filed in California state court and removed on June 28, 2012); *Hubuschman v. Zuckerberg*, 12cv7553 (filed in California state court and removed on June 28, 2012); and *Levy v. Zuckerberg*, 12cv7815.  *Childs* was subsequently voluntarily dismissed without prejudice.  On April 21, 2014, the District Court entered a judgment dismissing Mr. Crocitto's action as well as various actions subject to Derivative Opinion I.  On April 28, 2014, Plaintiff Levy filed a notice of appeal. On May 9, 2014, Plaintiff Cole filed a notice of appeal.

4

claims were not ripe for adjudication. [A-5-74]  (That opinion is referred to herein as "Derivative Opinion I", and is cited as 922 F. Supp. 2d 445)

On December 23, 2013, the District Court dismissed *Jones v. Andreessen et al.*, 13cv2830, (filed in the Delaware Court of Chancery and subsequently removed on April 5, 2013), on the grounds that the complaint failed to adequately plead demand futility and the claims were not ripe for adjudication, for substantially the same reasons set forth in Derivative Opinion I.  Also, plaintiffs in that action did not purchase Facebook stock on the open market, but, like Mr. Crocitto, purchased shares in Facebook before the IPO through SharesPost Units. The District Court also dismissed that action for lack of standing, holding that plaintiffs' ownership of SharesPost Units prior to the IPO was not enough to confer derivative standing because such units were not converted into Facebook common stock until after the IPO.  As such, the District Court held that plaintiffs were not contemporaneous owners of Facebook stock at the time of the alleged misconduct, and, therefore, did not have standing to maintain a derivative action.  [A-75-142]  (That opinion is referred to herein as "Derivative Opinion II," and is cited as 2013 WL 6798160. Derivative Opinion I and Derivative Opinion II are referred to collectively as the "Derivative Opinions".)

Mr. Crocitto's allegations as to demand futility and ripeness are largely similar to those in the Derivative Opinions, and Mr. Crocitto's allegations as to

5

equitable standing, by way of ownership of SharesPost Units, are largely similar to those in Derivative Opinion II.  Accordingly, on April 17, 2014, Mr. Crocitto and Appellees filed a stipulation with the District Court, stating that "[w]hile Crocitto disagrees with the application of facts and law underlying Facebook's notice of motion to dismiss and [the Derivative Opinions], Crocitto recognizes that the basis for the [Derivative Opinions], as both opinions currently stand, would likely require dismissal of the Crocitto Amended Complaint." [A-265] On April 21, 2014, the District Court entered a judgment dismissing Mr. Crocitto's action. [A-264]

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing actions subject to the Derivative Opinions.  Accordingly, this Action, as well as the actions subject to the Derivative Opinions, should be reinstated.

First, Mr. Crocitto has adequately alleged demand futility.   He has demonstrated that (1) a majority of Facebook's board was not disinterested or independent, and (2) the directors' actions concerning the IPO were not the product of a valid exercise of business judgment.

Second, Mr. Crocitto has standing to sue because he was a contemporaneous shareholder during the time of the wrongful conduct.  Mr. Crocitto's purchases of SharesPost Units, prior to the IPO, rendered him an equitable owner of Facebook

stock which gave him the right to sue.  This is supported by applicable case law, the plain language of Rule 23.1, and the public policy behind providing standing to equitable owners.

Third, Mr. Crocitto's claims are ripe.  While Mr. Crocitto alleges claims based on damages that may, in the future, result from governmental or regulatory fines or a settlement or judgment in the pending class action, he also alleges claims to recover current damages already sustained.

## STANDARD OF REVIEW

For the issues relating to Fed. R. Civ. P. 23.1, where "determination of the sufficiency of allegations of futility depends on the circumstances of the individual case, the standard of review for dismissals based on Fed. R. Civ. P. 23.1 is abuse of discretion."  *Halebian v. Berv,* 590 F.3d 195, 203 (2d Cir. 2009) (*quoting Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 137 (2d Cir. 2004)) (internal quotations omitted).  In terms of the other claims on appeal, including whether an Appellant's claims are ripe, the Second Circuit reviews "dismissals pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure *de novo*." *Halebian,* 590 F.3d at 203.

## ARGUMENT

### I.  THE DISTRICT COURT ERRED IN RULING THAT DEMAND FUTILITY WAS NOT ADEQUATELY PLED

The District Court erred, in the Derivative Opinions, when it held that the

7

plaintiffs in those actions failed to adequately allege that a demand on the board was futile.

### A.    Standard For Alleging Demand Futility Under Delaware Law

It is undisputed that since nominal Appellee Facebook is a Delaware corporation, demand futility is governed by Delaware law.  Under Delaware law, a shareholder must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  Del. Ct. Ch. R. 23.1(a); *Lambrecht v. O'Neal*, 3 A.3d 277, 282 n.11 (Del. 2010).  Accordingly, a plaintiff in a derivative suit who has not made a demand on the company's board of directors must state with particularity the reasons why demand is futile and therefore excused.  *FLI Deep Marine LLC v. McKim*, C.A. No. 4138-VCN, 2009 WL 1204363 (Del. Ch. Apr. 21, 2009).

"Delaware law provides alternative tests for determining whether demand would have been futile, one applicable to situations where the board's business judgment is being challenged and one where it is not."  *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 458 (S.D.N.Y. 2010).   The first test is applicable when directors acted or consciously failed to act with respect to contested transactions.  *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Demand is excused

8

under *Aronson* whenever a plaintiff alleges particularized facts creating a reason to doubt that: "(1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814; *see also In re Abbott Labs. Deriv. S'holders Litig*., 325 F.3d 795, 806-09 (7th Cir. 2003).   "These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused." *Brehm*, 746 A.2d at 256.   In short, under *Aronson*, demand will be excused as futile if the complaint alleges particular facts that call into question whether the board discharged its duty of loyalty (*Aronson's* first prong) or its duty of care (*Aronson's* second prong) at the time of a specific transaction." *Bryceland v. Minogue*, ___ Fed. Appx. ___, 2014 WL 2579298, at *3 (1st Cir. June 10, 2014).

The second test applies, not to business decisions, but rather violations of a board of directors' oversight duties.   The inquiry is "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v Blasband*, 634 A.2d 927, 934 (Del. 1993); *Wood v. Baum*, 953 A.2d 136, 140 (Del 2008).

9

### B.    Under Either The *Aronson* or *Rales* Test, Demand Is Excused

#### 1.    Demand Is Excused Under Both Branches Of The Aronson Test

The IPO debacle and resulting windfall to certain Appellees can be considered a board action or failure to act with respect to a transaction. Under *Aronson*, although only one test needs to be satisfied, here, it is clear that both (a) the board was not disinterested or independent and (b) the IPO was not the product of a valid exercise of business judgment.

#### a.    The Directors Were Not Disinterested Or Independent

Directors may be considered not disinterested or independent if they will receive a financial benefit from a transaction not equally shared by the stockholders, if there is a reasonable doubt they are subject to a substantial likelihood of liability, if the director is financially beholden to an interested person, or if the decision is based on extraneous considerations or influences rather than the corporate merits of the subject.[4] Here, the directors suffer from a variety of these infirmities and have violated their duty of loyalty.

---

[4] *See In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1189 (N.D. Cal. 2007) (director is interested if he receives a financial benefit not shared equally by stockholders); *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (plaintiff may also raise reasonable doubt regarding the disinterestedness of directors by demonstrating that they are subject to a "substantial likelihood of liability"); *In re Baster Int'l S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995) (directors who are sued for failure to oversee subordinates "have a disabling interest when the

10

### i.    The Directors Received A Financial Benefit Not Shared By All Shareholders

Directors Zuckerberg, Breyer, and Thiel (the "Selling Directors") sold shares in the IPO for gross proceeds of over $3 billion.  AC  ¶¶ 45, 65, 67 [A-155, 162-63].  A portion of these proceeds was undoubtedly a result of Facebook's failure to publicly disclose material information, including information regarding the impact of Facebook's mobile growth on the Company's revenue.  Defendants' selective disclosure caused the IPO price to be artificially inflated, allowing the Selling Directors to reap additional benefits. This benefit was not shared by all Facebook shareholders, but rather only by those who sold shares in the IPO, and Appellant was certainly not in this group.  Indeed, the only "benefit" Appellant received from the botched IPO is owning shares in a company facing liability under the federal securities laws.  The Selling Directors are not interested merely because they sold shares; they are rendered interested because they sold shares and received a benefit not shared by the other stockholders while in possession of revised revenue estimates not known to the public.  While Facebook was revising its estimates and

---

potential for liability is not a mere threat but instead may rise to a substantial likelihood") (internal quotations omitted); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1050 (Del. 2004) (a director's independence may be compromised if he or she is so personally or financially beholden to an interested person, or an interested entity, that "his or her discretion [is] sterilized") (internal quotations omitted; *Aronson*, 473 A.2d at 816 ("Independence means that a director's decision is based on the corporate merits of the subject before the before rather than extraneous considerations or influences.").

11

sharing this information with the underwriters and large institutions AC ¶¶ 30-34, 37-40 [A-151-53], the Selling Directors were raising the selling price of shares in the IPO.   AC ¶ 42 [A-154].   The District Court mistakenly stated the internal projections were "publicly disseminated."   Derivative Opinion I at 54 [A-58], 922 F. Supp. 2d at 469.   They were not.   The projections were shared privately with large institutional investors and all the public was told was that there was a general trend towards mobile usage, with no projections or numbers mentioned.   AC ¶ 38 [A-153].   Given the financial benefits the IPO would create for them, the Selling Directors were interested in the transaction, to the tune of billions of dollars.[5]

### ii.    Director Sandberg

Director Sandberg is the COO of Facebook.   AC ¶ 66 [A-163].   She earns her living at Facebook and is dependent on it.   Appellee Zuckerberg as CEO, Chairman of the Board, and controlling stockholder, can discharge Director Sandberg at any time.   The District Court held that "Delaware law does not assume that directors have a self-interest in preserving their positions."   Derivative Opinion II at 56 [A-130], 2013 WL 6798160, at *20.   However, the error of this

---

[5] *See, e.g., Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.  The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

statement is that Sandberg is not interested because she desired to keep her position as director. She is interested because she desired to keep her position as COO and needed to placate Appellee Zuckerberg in order to do so.

### iii. Demand Was Excused Based Upon The Substantial Likelihood Of Director Liability Alleged

Although the District Court held that the question of interestedness based upon a substantial likelihood of personal liability required "closer analysis", the court erred, in the two Derivative Opinions, in holding that demand was not excused based upon a substantial likelihood of liability. *See*, *e.g*., *Pfizer*, 722 F. Supp. 2d at 460 (holding not only that demand was excused under the second prong of the *Aronson* test based on allegations that the directors consciously turned a blind eye to wrongdoing, but that demand was also excused under such circumstances because Pfizer's directors were not disinterested due to "a substantial threat of personal liability"). Facebook and Morgan Stanley are currently defendants in a securities fraud class action pending in the Southern District of New York. The case has survived a motion to dismiss and is heading towards trial. AC ¶ 14 [A-144-45]. Morgan Stanley, of which Appellee Bowles is a director, was fined by the Commonwealth of Massachusetts. AC ¶ 17 [A-145]. Liability for the misconduct in the IPO is not a distant possibility; it is a substantial likelihood.

13

### iv.    The Decision To Proceed With The IPO And Withhold Material Information

Mr. Crocitto's Complaint adequately alleges that the Appellee directors allowed Facebook to complete the IPO despite the materially incomplete disclosure because of their own conflicting personal financial interests in the IPO. Appellees Zuckerberg, Breyer, and Thiel sold billions of dollars at the inflated IPO price. AC ¶¶ 45, 65, 67 [A-155, 162-63]. Additionally, the Complaint set forth specific factual allegations that the Company was aware that the revised estimates of which they undertook an effort to partially disclose were being selectively disclosed by Company executives. *See* AC ¶¶ 33-38 [A-152-53]. Mr. Crocitto's specific factual allegations are sufficient to create a reasonable doubt that a majority of Facebook's Board was conflicted in the IPO transaction and therefore incapable of properly considering demand.

### v.    Directors Bowles and Andreessen

Director Bowles is subject to extraneous considerations that cast doubt on his ability to independently determine the merits of this case. In addition to being a director of Facebook, Bowles is also a director of Morgan Stanley. Morgan Stanley was a lead underwriter of the IPO that is also facing its own lawsuits involving the IPO. If he was to decide this case has merit and accept a "demand" to sue he would be in effect inviting and encouraging litigation against Morgan

14

Stanley, to whom he also owes a fiduciary duty.  With such divided loyalties, he cannot be considered disinterested.  *See Siegman v. Tri-Star Pictures, Inc.*, 1989 WL 48746 (Del. Ch. May 30, 1989).  The District Court stated that directors could independently consider whether to take action that could cause "tangential harm" to a company with which they are affiliated.  Derivative Opinion I at 61 [A-65], 922 F. Supp. 2d at 471.  Here, however, the harm is not tangential to Morgan Stanley.  It is direct and immediate, as Morgan Stanley is a defendant in related securities actions.

Director Andreessen is not merely a director of Facebook, he is also a significant private investor.  AC ¶ 69 [A-163].  He cannot be expected to take action that will potentially cost him millions of dollars.  In addition, Director Andreessen does considerable business with Facebook and reaped $78 million on one deal alone.  *Id.*  Furthermore, as a regular investor venture capitalist who runs a venture capital firm, his professional reputation is at stake as a result of the misconduct alleged in this action.  If he were to properly consider a demand, it could be perceived by many as sign of weakness, or an admission of failure of duty, that could affect his ability to maximize the value of his future venture capital dealings, especially those that ultimately result in an IPO. AC ¶ 73 [A-164].

### b. The Actions Involved In The IPO Were Not The Product Of A Valid Exercise Of Business Judgment

The District Court also erred in the Derivative Opinions by ruling that the plaintiffs had not adequately alleged demand futility despite the plaintiffs' allegations demonstrating that defendants' conscious failures to act were not protected by the business judgment rule and have violated their duty of care.[6]  As one court aptly stated:

> In short, by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused.  Although directors have wide authority to take lawful action on behalf of the corporation, they have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators.  Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully.  The knowing use of illegal means to pursue profit for the corporation is director misconduct.

*Desimone v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007).

The District Court focused on the lack of duty to disclose internal projections.  Derivative Opinion I at 64 [A-68], 922 F. Supp. 2d at 472-73.  The

---

[6] *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey"); *In re Massey Energy Co*., C.A. No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) ("Delaware law does not charter law breakers"); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc*., 854 A.2d 121, 131 (Del. Ch. 2004) ("[u]nder Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.").

16

error in this analysis is not that the directors merely failed to disclose internal projections to the public, but that Facebook employees <u>selectively</u> disclosed internal projections to the lucky few, which is a clear violation of law.

### i.    The Board Knew Of The Second Quarter Results

The Complaint contains detailed factual allegations that the Board was made aware of the second quarter results to date and the revised internal revenue estimates based thereon.  On May 9, 2012, some nine days before one of the largest IPOs in U.S. history, Ebersman, the Company's CFO, emailed the Board of Directors to "inform them that a revised Registration Statement would be filed." AC ¶ 3 ("On May 9, 2012, Ebersman emailed Facebook's board, notifying them that they would be updating the form S-1 to include such cautionary language.") [A-152].  The Company then filed an amended S-1 Registration Statement on May 9 (signed by all Facebook Directors, which only vaguely described that Facebook's experience in Q2 to date indicated the trend of daily active users increasing more rapidly than ads delivered was continuing.  AC ¶ 3 [A-153].

### ii.    The Board Signed-Off On The Registration Statement

The Complaint adequately alleges that the Board signed off on the materially incomplete Registration Amendments after having been made aware of the second quarter numbers and revised internal revenue estimates.  As the Complaint sets

17

forth, the amended S-1 was filed on May 9, 2012, and was signed by the entire Board at the time.  AC ¶ 45 [A-154].  The Final Registration Statement was filed by Facebook on May 16, 2012 and signed by each board member at the time on May 15, 2012.  AC ¶ 43 [A-154].  The Final Registration Statement failed to mention the lower guidance or adequately address the Company's risks due to increased mobile usage.

### 2.    The Complaint Adequately Alleges Demand Futility Under the Rales Test.

"*Rales* applies where the subject of a derivative action is not a board's business decision but rather its failure to oversee."  *Bryceland,* 2014 WL 2579298, at \*3.  If the Court decides that the allegations in this case amount to a failure of oversight, Mr. Crocitto has still adequately pled demand futility.

At the time this action was commenced, the Company's Board consisted of eight members: Zuckerberg, Breyer, Thiel, Andreessen, Bowles, Graham, Hastings, and Sandberg.  Thus, to adequately allege demand futility, Mr. Crocitto need only have alleged that at least four of the Company's directors could not reasonably be expected to respond to a demand in good faith and respond to a demand by properly exercising its independent and disinterested business judgment.  The District Court erred, in the Derivative Opinions, in finding plaintiffs there had not adequately alleged so.

18

The Complaint pleads specific factual allegations showing that these directors had personal financial interests in the IPO. Thus at the time the Complaint was filed, at least six of the eight directors were interested.

## II.    THE DISTRICT COURT ERRED WHEN IT RULED THAT OWNERSHIP OF SHARESPOST UNITS DID NOT CONFER A BENEFICIAL OWNERSHIP IN FACEBOOK

### A.    The District Court Erroneously Applied A Heightened Pleading Standard To Determine That Plaintiff Did Not Adequately Plead Contemporaneous Stock Ownership

To satisfy the pleading requirements of Rule 23.1 of the Federal Rules of Civil Procedure, a plaintiff in a derivative suit must "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law."[7] Mr. Crocitto has satisfied these pleading requirements by pleading that he (1) "beneficially purchased Facebook shares through the purchase of Series 2 Membership Units of SharesPost Private Investments, LLC on March 4, 2011 and May 25, 2011"; (2) the units converted to Facebook common stock after the IPO, and (3) he continuously held Facebook common stock. Complaint ¶ 10.[8] As such, Mr. Crocitto has alleged more than is required under Rule 23.1.

_____

[7] Section 327 of the Delaware General Corporation Law parallels this contemporaneous ownership requirement.

[8] In addition, Mr. Crocitto, in his Amended Complaint, attached documentation evidencing his purchases of Series 2 Membership Units that were later converted into Facebook Class B Common Stock. [A-173-62]

Indeed, the District Court found that "plaintiffs [who had purchased through SharesPost] have pled that they were stockholders during the alleged misconduct and have been continuous stockholders to this day", Derivative Opinion II at 36 [A-110], 2013 WL 6798160, at *13, but improperly applied a heightened pleading standard to determine that such allegations were insufficient. *Id*. *See Plymouth County Ret. Ass'n v. Schroeder,* 576 F. Supp. 2d 360, 374 (E.D.N.Y. 2008) ("an allegation that merely employs the language of the rule has been held sufficient to sustain the complaint against a motion to dismiss") (internal quotations omitted).

Furthermore, the language of Rule 23.1 contains no heightened pleading standard for pleading ownership. While Rule 23.1(b)(3) requires that a plaintiff "state with particularity" his reasons why demand should be excused, Rule 23.1(b)(1) only requires that plaintiffs "allege" contemporaneous ownership of stock. Thus, the plain language of Rule 23.1 indicates that the issues of ownership need not be pled with particularity.

In fact, even the cases cited by the District Court, *see* Derivative Opinion I at 40, n.17, 922. F. Supp. 2d at 464, n.17, do not support its use of a heightened pleading standard. For example, in *Metcalf v. Zoullas*, No. 11 Civ. 3996 (AKH), 2012 WL 169874, at *3 (S.D.N.Y. Jan. 19, 2012), the court's discussion of a heightened pleading standard concerned the pleading of demand futility, and not the requirements for pleading contemporaneous ownership. Similarly, Crocitto's

20

contemporaneous ownership allegations do not run afoul of the standard set forth

in *In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d. 919, 926 (N.D. Cal.

2010), also relied upon by the District Court.  In *Accuray*, the court reasoned that

because plaintiffs simply alleged that they were shareholders "at the time of the

continuing wrongs complained of herein" and did not identify when they

purchased their shares, they had not met Rule 23.1's pleading requirements.  *Id*.

(internal quotations omitted).  By contrast, Crocitto specified when he made his

Facebook stock purchases and therefore adequately alleged contemporaneous

ownership under Rule 23.1.

**B.    The District Court Erred When It Ruled Purchases Of Units Through SharesPost Did Not Confer Equitable Ownership Of Facebook Stock**

Even if it is found that Mr. Crocitto did not adequately allege actual

ownership of Facebook stock prior to the IPO, Mr. Crocitto nonetheless has

standing as a pre-IPO equitable owner of Facebook stock.  Mr. Crocitto purchased

his shares of Facebook stock through the purchase of Series 2 Membership Units

of SharesPost Private Investments, LLC more than a year before Facebook's IPO,

making him an equitable owner prior to the conversion of the units.  See AC ¶ 10

and attachments [A-146, 173-262].  It has long been the law of Delaware that "an

21

equitable owner of stock can maintain a stockholder's derivative action."[9] Nonetheless, the District Court incorrectly found that similar purchasers, who also purchased SharesPost Units, were not equitable owners, but rather "prospective stockholders with an uncertain contractual right to future shares."  Derivative Opinion II at 43 [A-117].

The policy considerations behind the contemporaneous ownership requirement are to "eliminate strike suits and other abuses which developed along with the derivative suit," including the "purchasing of shares in order to maintain a derivative action." *Jones*, 348 A.2d at 191.  While the contemporaneous ownership requirement is a cornerstone of Delaware law, "the statute should not be interpreted so as to prevent reasonable opportunities to rectify corporate aberrations" and Section 327 should be "liberally construed in situations where its primary purpose will not be frustrated thereby."  *Id*. (internal quotations omitted); *see also In re MAXXAM, Inc./Federated Dev. S'holders Litig*., 698 A.2d 949, 956 (Del. Ch. 1996) (Section 327 should be "liberally construed so as not to frustrate its primary purpose.").  Here, Mr. Crocitto, who purchased his interests in

---

[9] *See Rosenthal v. Burry Biscuit Corp*., 60 A.2d 106, 113 (Del. Ch. 1948) (finding plaintiff had standing to maintain a derivative action where he was an equitable, but not the record owner of stock at the time of the challenged transaction).  *See also Jones v. Taylor*, 348 A.2d 188, 190 (Del. Ch. 1975) ("for purposes of a derivative action, the term 'stockholder' as employed in Section 327 includes an equitable owner"); *In re Pennington v. Neukomm*, Civ. A. 4172, 1973 WL 463, * 3 (Del. Ch. Oct. 3, 1973), *aff'd*, 344 A.2d 386 (Del. 1975).

Facebook more than a year before the IPO, and well before the misconduct at issue occurred, clearly did not make such purchases in order to maintain a derivative action. Thus, a finding that Mr. Crocitto, whose interest in SharesPost was "associated exclusively with the Facebook Securities to be purchased with the proceeds of the Company's sale of its Series 2 Membership Units" (Subscription Agreement at 3(f)) [A-175-218], was an equitable owner of Facebook prior to the IPO would not frustrate Section 327's purpose.

The District Court improperly determined, in Derivative Opinion II, that owners of SharesPost units were not equitable owners of Facebook stock because their "future ownership of Facebook shares at the time they purchased shares in the SharesPost SPV was not a certainty. The SharesPost SPV could distribute Facebook shares, cash or a combination of the two after the IPO at the discretion of SharesPost." Derivative Opinion II at 42 [A-116], 2013 WL 6798160, at *15. Contrary to the District Court's finding, however, there need not be "contractual certainty" of future receipt of company stock in order to find that one was an equitable owner of the stock.

For example, in *Pennington v. Neukomm*, the court found that plaintiff, who under the terms of a separation agreement with the defendant husband, had a contractual right to half of his stock of a certain company or the cash equivalent at the end of a six-year period, was an equitable owner of that stock. 1973 WL 463,

23

*3 (Del. Ch. Oct. 3, 1973), *aff'd*, 344 A.2d 386 (Del. 1975).  The court reasoned that "in one sense of the word [plaintiff] has already purchased the stock by entering into the separation and property settlement agreement with [defendant]." *Id*.  Similarly, in *Jones v. Taylor*, the plaintiff entered into a contract releasing all possessory interest in the stock of a corporation to her mother in return for her mother's promise to execute a will bequeathing one-half of the stock or its equivalent in proceeds, to the plaintiff upon her mother's death.  348 A.2d 188, 190 (Del. Ch. 1975).  The court found that although she did not currently have possessory interest and may never actually receive the stock she had "bargained for the eventual ownership of the stock" and thus had "the necessary equitable interest to maintain a derivative suit." *Id*. at 192.   The same holds true for Mr. Crocitto.

The agreement as issue here is nothing like the warrants, convertible debentures and options that the District Court used by analogy.  Mr. Crocitto entered into "irrevocable" agreements (SharesPost Subscription Agreement ¶ 1) [A-174, 217] to purchase interests in Facebook stock and whose eventual ownership interest the stock was left to the sole discretion of SP Investment Management, LLC (SharesPost Operating Agreement ¶ 4.2) [A-196-97, 237-39]. By contrast, holders of options, warrants and convertible debentures "have a choice whether to take an investment risk or not," but Mr.  Crocitto's contracts, like the contracts of plaintiffs in *Pennington* and *Jones v. Taylor*, "represented terms on

24

which that choice was already made." *In re New Valley Corp. Deriv. Litig*, 2004 WL 1700530, at *6 (Del Ch. Jun. 28, 2004). Holders of options, warrants, and convertible debentures still have to make a choice before they can receive shares. Mr. Crocitto had already made his choice.

## III. THE DISTRICT COURT ERRED WHEN IT RULED THAT THE CLAIMS ALLEGED IN THE DERIVATIVE ACTIONS WERE NOT RIPE

Mr. Crocitto's claims are ripe. Real and significant harm has occurred by the disgorgement of profits and increased cost of capital resulting from Appellees' wrongful conduct. Amended Complaint, ¶¶ 50-52 [A-158]. Appellees' profits have been received; Facebook's profits have been lost.

### A. The District Court Improperly Conflated A Prudential Standing Test Into A Constitutional Standing Analysis

"'Ripeness' is a term that has been used to describe two overlapping threshold criteria for the exercise of a federal court's jurisdiction." *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,* 725 F.3d 65, 109 (2d Cir. 2013). The first such requirement, referred to as "constitutional ripeness" is drawn from Article III limitations on judicial power. *Id.* The second requirement is drawn from prudential reasons for deciding to not exercise jurisdiction. *Id.,* at 110. The court here, as it did in *MTBE*, should find that a claim can be constitutionally ripe even in the face of "prudential" concerns. *Id.* (finding that claim was ripe based

upon injury in fact, even though the scope of the injuries sustained were not yet ascertainable because of pending litigation).

The District Court began its analysis stating that ripeness is a "constitutional prerequisite to the exercise of jurisdiction by a federal court". Derivative Opinion I at 65 [A-70], 922 F. Supp. 2d at 473. Ripeness, as a <u>constitutional</u> prerequisite, refers to whether Mr. Crocitto, derivatively on behalf of Facebook, has suffered an "injury in fact." *See, Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As the Supreme Court has held, this injury in fact requirement is satisfied by "proof of <u>some</u> damage" flowing from a defendant's wrongful conduct. *Zenith Radio Corp. v. Hazeltine Research, Inc*. 395 U.S. 100, 114 n.9 (1969) (emphasis). Instead of a discussion of constitutional ripeness, however, an analysis of exclusively prudential considerations followed in the District Court opinion. As the District Court stated, "[i]n order to determine whether an issue is ripe for adjudication, a court must make a fact-specific evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" Derivative Opinion I at 66 [A-70], 922 F. Supp. 2d at 473. A claim is fit for review when it requires no further factual development to crystalize the legal issues and aid the court in resolving them. *Id.* (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 727, 118 S.Ct. 1665 (1998)). These are purely "prudential" considerations having nothing to do with Article III ripeness.

The District Court also relied upon *United States v. Fell,* 360 F.3d 135, 140 (2d Cir. 2004), where the Second Circuit *sua sponte* held that a criminal defendant's pre-trial constitutional challenge of the Federal Death Penalty Act of 1994 was ripe for adjudication. The Court stated "the <u>defendant has not been tried, let alone convicted</u>; thus, he may never be subjected to a penalty phase in which the government has sought to introduce the challenged evidence." *Id.* at 139 (emphasis added). Despite the Court's recognition that the consequences in question were contingent upon future events not certain to occur, the Court held that the possibility of a future death penalty trial and conviction caused the defendant "practical and legally cognizable disadvantages" and that defendant "may be forced into trial tactics that are designed to avoid the death penalty." *Id.* at *140.

Likewise, Appellant in this case seeks redress for costs, settlements, and fines associated with the pending class action, as well as for the practical and legally cognizable disadvantages that they suffered in anticipation of those consequences, and as an immediate and tangible result of Appellees' wrongful conduct, namely increased cost of capital, disgorgement of corporate profits, reputational harm to the corporation's value, loss of improper underwriting fees and financial benefits, and the costs associated with avoiding future litigation and regulatory damages. AC ¶¶ 50-52 [A-158].

27

Prudential ripeness is a tool that courts can use "to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary." *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003). Here, as in *MTBE*, this Court should be examining only the existence of an injury in fact to determine the existence of Article III - or "constitutional" - ripeness.

## B.    Mr. Crocitto's Derivative Claims Are Constitutionally Ripe

As stated earlier, Appellees' gains have been realized, and the damage is done.  The District Court's prior decision on the issue of ripeness focused primarily on the damages that <u>may</u> result from governmental or regulatory fines or a settlement or judgment in the pending class action.  Derivative Opinion I at 68-70 [A-72-74], 922. F. Supp. 2d 473-75. The Court's focus, however, ignored the injury in fact, the <u>current damages already sustained</u> by the Company as a result of the Individual Appellees' breaches of their fiduciary duties.  Specifically, the Complaint alleges that Appellees' conduct "has presently caused Facebook significant harm both to its cost of capital as well as to its financial and management reputation, which in turn makes it more expensive for it to raise capital of all kinds." AC ¶ 51 [A-158].  Thus, while the Complaint alleges damages related to the pending class action, it also alleges damages sustained by the Company that are not dependent upon the outcome of the class action litigation involving Facebook and its directors.  Under Delaware law a claim for "[d]amage

28

to one's business and reputation is a cognizable injury for which damages may be awarded if the underlying charges are proved." *In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 1999 U.S. Dist. LEXIS 17472 (D.N.J. 1999). Whether there is some speculation as to the extent or scope of injuries sustained is irrelevant, it is that some injury was sustained that is the ultimate question.

In *Sonkin v. Barker*, 670 F. Supp. 249 (S.D. Ind. 1987), the Court refused to dismiss a shareholder derivative action based upon the identical argument, stating:

> [T]he plaintiffs' complaint alleges damages to PSI beyond those attributable to proceedings not yet concluded. The existence of such damages is not contingent on the outcome of the pending lawsuits. For example, the plaintiffs allege damages for PSI's expenditures for legal and other professional fees, its loss of present and future business opportunities, its increased interest expense, its difficulty in obtaining credit and raising funds via issuance of public securities, and the harm to its business reputation and standing in the community.

*Sonkin*, 670 F. Supp. at 253.

Similarly, *In re RasterOps Corp. Sec. Litig.*, 1993 U.S. Dist. LEXIS 21504 (N.D. Cal. Sept. 9, 1993), the Court recognized that claims arising from damage to business reputation are distinct from claims for damages that may arise from concurrent lawsuits:

> [P]laintiffs' Complaint in the present case alleges damages to RasterOps beyond those attributable to proceedings not yet concluded. The Complaint contains allegations of present injury caused by defendants' breach of their fiduciary duties, in addition to allegations of potential injury resulting from the class action suit.

29

*Id.* at *8-9.

Accordingly, the existence of pending litigation that could impact the scope of damages should not be conflated into a simple analysis of whether there exists some injury in fact. Mr. Crocitto has set forth sufficient allegations to state that an injury has been caused, and the dismissal should be reversed.

## CONCLUSION

For the foregoing reasons, Mr. Crocitto (1) has standing to sue, through his beneficial ownership in Facebook stock, (2) has adequately alleged that a majority of Facebook's directors were not independent or disinterested, and (3) has ripe claims. Accordingly, the dismissal of the *Crocitto* Action should be reversed in its entirety.

Dated: June 25, 2014

GLANCY BINKOW & GOLDBERG LLP

By: /s/ Brian P. Murray
Brian P. Murray
bmurray@glancylaw.com
Gregory B. Linkh
glinkh@glancylaw.com
122 E. 42nd Street, Suite 2920
New York, New York  10168
Telephone: (212) 682-5340

Mark R. Rosen
mrosen@barrack.com
BARRACK, RODOS & BACINE
Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA  19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Fred T. Isquith
Isquith@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4690
Facsimile: (212) 545-4653

Richard S. Wayne
rswayne@strausstroy.com
STRAUSS & TROY
The Federal Reserve Building
150 East Fourth Street
4th Floor
Cincinnati, Ohio  45202
Telephone: (513) 629-9472
Facsimile: (513) 629-9426

Counsel for Plaintiff

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
       32(a)(7)(B) because:

       This brief contains 7,971 words, excluding the parts of the brief
       exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted by
       Microsoft® Office Word 2010.

2.    This brief complies with the typeface requirement of Fed. R. App. P.
       32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

       This brief has been prepared in a proportionally spaced typeface using
       Microsoft® Office Word 2010, in 14 pt. font size, Times New Roman.

       /s/ Gregory Linkh

       Attorney for Appellant Robert Crocitto

       Dated:  June 25, 2014