# 14-1309-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———◆◆———

ROBERT CROCITTO, Derivatively on behalf of FACEBOOK, INC.,

*Plaintiff-Appellant,*

—against—

MARK E. ZUCKERBERG, JAMES W. BREYER, PETER A. THIEL, MARC L. ANDREESSEN, ERSKINE B. BOWLES, DONALD E. GRAHAM, REED HASTINGS,

*Defendants-Appellees,*

FACEBOOK, INC.,

*Nominal Defendant-Appellee.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## RESPONSE BRIEF FOR DEFENDANTS-APPELLEES

RICHARD D. BERNSTEIN
ELIZABETH J. BOWER
WILLKIE FARR
  & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000

SUSAN E. ENGEL
KELLEN S. DWYER
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000

ANDREW B. CLUBOK
BRANT W. BISHOP, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Counsel for Defendants-Appellees*
*(additional counsel listed on signature block)*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, I hereby certify that Facebook, Inc. has no parent company, and no publicly held company owns more than ten percent of its stock.

*/s/ Andrew B. Clubok*

Andrew B. Clubok
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

**TABLE OF CONTENTS**

**Page(s)**

CORPORATE DISCLOSURE STATEMENT..............................................i

INTRODUCTION .......................................................................... 1

STATEMENT OF JURISDICTION........................................... 4

STATEMENT OF THE ISSUES.................................................. 4

STATEMENT OF THE CASE AND THE FACTS ..................................... 4

    A.    Facebook Disclosed Risks Related To Mobile Use................. 6

    B.    Dozens of Lawsuits Are Filed After Facebook's IPO............ 10

    C.    The District Court's Decisions Dismissing The Other Derivative Actions.................................................................... 13

    D.    The District Court's *Securities Decision*. ............................. 15

    E.    The District Court's Decision Dismissing This Action. ........ 17

    F.    The Derivative Appeals. ........................................................ 18

STANDARD OF REVIEW....................................................... 18

SUMMARY OF ARGUMENT .................................................. 19

ARGUMENT ............................................................................. 20

I.    The District Court Did Not Abuse Its Discretion In Finding That Crocitto Failed To Plead Demand Futility............................ 20

    A.    The District Court Did Not Abuse Its Discretion In Finding Inadequate Crocitto's Allegations That Directors Were Interested In This Litigation. ...................... 23

        1.    The District Court Did Not Abuse Its Discretion In Ruling That The Alleged Stock Sales Did Not Render Any Director Interested in This Lawsuit........ 24

2.    The District Court Did Not Abuse Its Discretion In Ruling That Crocitto Did Not Adequately Allege That Directors Knowingly Violated Disclosure Obligations. ................................................. 26

B.    The District Court Did Not Abuse Its Discretion In Finding Inadequate Crocitto's Allegations That Directors Lacked Independence. ........................................... 44

II.    Crocitto Did Not Adequately Allege Contemporaneous Share Ownership. ...................................................................................... 50

A.    As Crocitto Admitted, He Did Not Own Facebook Stock At The Time Of The IPO. ...................................................... 52

B.    The District Court Correctly Rejected Crocitto's Equitable Ownership Claim. ................................................ 54

III.    Crocitto's Claims Are Not Ripe. ............................................... 62

A.    There Is No Requirement That A Court Only Consider Constitutional Ripeness. ...................................................... 62

B.    Crocitto's Claims Are Not Ripe ........................................... 64

CONCLUSION ........................................................................................ 70

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7547 Partners v. Beck*,
   682 A.2d 160 (Del. 1996)........................................................................61

*Am. Savs. Bank, FSB v. UBS Fin. Servs. Inc.*,
   347 F.3d 436 (2d Cir. 2003) ..................................................................63

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
   545 A.2d 1171 (Del. 1988).....................................................................56

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984)........................................................21, 23, 45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................53

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*,
   155 F.3d 59 (2d Cir. 1998) .....................................................................52

*Bankers Trust Co. v. Rhoades*,
   859 F.2d 1096 (2d Cir. 1988) ................................................................65

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
   845 A.2d 1040 (Del. 2004).......................................................20, 45, 47

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000)..................................................................48, 49

*Connecticut v. Duncan*,
   612 F.3d 107 (2d Cir. 2010) ..................................................................18

*DeMaria v. Andersen*
   318 F.3d 170 (2d Cir.2003) .............................................................32, 36

*Desimone v. Barrows*,
   924 A.2d 908 (Del. Ch. 2007)...........................................19, 22, 28, 46

iv

*DiRienzo v. Lichtenstein,*
   2013 WL 5503034 (Del. Ch. 2013)..........................................................23

*Ensign Corp. v. Interlogic Trace, Inc.,*
   1990 WL 213085 (S.D.N.Y. 1990)..........................................................50

*Falkenberg v. Baldwin,*
   1977 WL 1025 (S.D.N.Y. 1977)..............................................................66

*Fink v. Weill,*
   2005 WL 2298224 (S.D.N.Y. 2005)........................................................21

*Gamble v. Penn Valley Crude Oil Corp.,*
   104 A.2d 257 (Del. Ch. 1954)................................................................55

*Garcia v. Hartford Police Dep't,*
   706 F.3d 120 (2d Cir. 2013) ..................................................................69

*Glassman v. Computervision Corp.,*
   90 F.3d 617 (1st Cir. 1996) ....................................................................44

*Griggs v. Jornayvaz,*
   2010 WL 4932674 (D. Colo. 2010) .......................................................51

*Grobow v. Perot,*
   539 A.2d 180 (Del. 1988)........................................................................48

*Guttman v. Huang,*
   823 A.2d 492 (Del. Ch. 2003)..........................................................24, 25

*Halebian v. Berv,*
   590 F.3d 195 (2d Cir. 2009) ..................................................................19

*Harff v. Kerkorian,*
   324 A.2d 215 (Del. Ch. 1974)..........................................................55, 58

*Harold Grill 2 IRA v. Chenevert,*
   2013 WL 3014120 (Del. Ch. 2013)........................................................30

*Helvering v. Sw. Consol. Corp.,*
   315 U.S. 194 (1942)................................................................................55

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ................................................................ 37

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) ................................................................ 6

*In re Aozora Bank Ltd. v. SIPC*,
  480 B.R. 117 (S.D.N.Y. 2012) ............................................................ 53

*In re Bank of New York Deriv. Litig.*,
  320 F.3d 291 (2d Cir. 2003) ............................................................... 18

*In re Bernard L. Madoff Inv. Sec. LLC*,
  708 F.3d 422 (2d Cir. 2013) ............................................................... 53

*In re Caremark Int'l Inc. Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996) ............................................................ 27

*In re Cendant Corp. Deriv. Litig.*,
  189 F.R.D. 117 (D.N.J. 1999) ............................................................ 67

*In re Citigroup Inc. S'holder Deriv. Litig.*,
  964 A.2d 106 (Del. Ch. 2009) ....................................................... 28, 47

*In re Cray, Inc.*,
  431 F. Supp. 2d 1114 (W.D. Wash. 2006) ..................................... 66, 68

*In re Dow Chem. Co. Deriv. Litig.*,
  2010 WL 66769 (Del. Ch. 2010) ........................................................ 24

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  2013 WL 6798160 (S.D.N.Y. 2013) .............................................. passim

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  899 F. Supp. 2d 1374 (J.P.M.L. 2012) .............................................. 11

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  922 F. Supp. 2d 445 (S.D.N.Y. 2013) ........................................... passim

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................................... passim

*In re FBR Inc. Sec. Litig.,*
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) ....................................................33

*In re Focus Media Holding Ltd. Litig.,*
   701 F. Supp. 2d 534 (S.D.N.Y. 2010) ..............................................33, 38

*In re Forest Labs. Inc. Deriv. Litig.,*
   450 F. Supp. 2d 379 (S.D.N.Y. 2006) ....................................................25

*In re Goldman Sachs Group, Inc. S'holder Litig.,*
   2011 WL 4826104 (Del. Ch. 2011)....................................................46, 47

*In re IAC/InterActiveCorp Sec. Litig.,*
   478 F. Supp. 2d 574 (S.D.N.Y. 2007) ....................................................48

*In re Methyl Tertiary Butyl Ether*
*("MTBE") Prods. Liability Litig.,*
   725 F.3d 65 (2d Cir. 2013) ..............................................................62, 66

*In re N2K Sec. Litig.,*
   82 F. Supp. 2d 204 (S.D.N.Y.) ..................................................32, 36, 39

*In re New Valley Corp. Deriv. Litig.,*
   2004 WL 1700530 (Del. Ch. 2004)..........................................55, 59, 61

*In re Nine Sys. Corp. S'holders' Litig.,*
   2013 WL 771897 (Del. Ch. 2013)..........................................................55

*In re Noah Educ. Holdings Ltd. Sec. Litig.,*
   2010 WL 1372709 (S.D.N.Y. 2010)..................................................33, 38

*In re Prestige Brands Holding, Inc.,*
   2006 WL 2147719 (S.D.N.Y. 2006)........................................................25

*In re ProShares Trust Sec. Litig.,*
   728 F.3d 96 (2d Cir. 2013) ....................................................................36

*In re Sagent Tech., Inc.,*
   278 F. Supp. 2d 1079 (N.D. Cal. 2003)................................................49

*In re Symbol Techs. Sec. Litig.,*
   762 F. Supp. 510 (E.D.N.Y. 1991) ..................................................65, 67

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*
   202 F. Supp. 2d 8 (S.D.N.Y. 2001) ..................................................37, 39

*In re United Telecomms., Inc., Sec. Litig.,*
   1993 WL 100202 (D. Kan. 1993) ........................................65, 66, 67, 68

*In re Walt Disney Co. Deriv. Litig.,*
   731 A.2d 342 (Del. Ch. 1998) ................................................................49

*Jacobs v. Yang,*
   2004 WL 1728521 (Del. Ch. 2004)........................................................47

*Jones v. Taylor,*
   348 A.2d 188 (Del. Ch. 1975)................................................58, 59, 60, 61

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.,*
   412 F.3d 418 (2d Cir. 2005) ..................................................................64

*Khanna v. McMinn,*
   2006 WL 1388744 (Del. Ch. 2006)........................................................48

*Lefort v. Black,*
   2003 WL 1563997 (N.D. Cal. 2003)......................................................51

*Litwin v. Blackstone Group, L.P.,*
   634 F.3d 706 (2d Cir. 2011) ..................................................16, 40, 41, 42

*Louisiana Mun. Police Employees' Ret. Sys. v. Hesse,*
   962 F. Supp. 2d 576 (S.D.N.Y. 2013) ..................................22, 29, 30, 47

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)...............................................................................69

*Lyondell Petrochemical Co. Sec. Litig.,*
   984 F.2d 1050 (9th Cir. 1993)...............................................................43

*N.Y. City Envtl. Justice Alliance v. Giuliani,*
   214 F.3d 65 (2d Cir. 1999) ....................................................................68

*N.Y. Civil Liberties Union v. Grandeau,*
   528 F.3d 122 (2d Cir. 2008) ..................................................................63

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.,*
681 F.3d 114 (2d Cir. 2012) .............................................................. 16, 40

*Pennington v. Neukomm,*
1973 WL 463 (Del. Ch. 1973) ................................................. 58, 59, 60

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines,*
534 F.3d 779 (D.C. Cir. 2008) .............................................................. 21

*Plymouth Cnty. Ret. Ass'n v. Schroeder,*
576 F. Supp. 2d 360 (E.D.N.Y. 2008) .................................................. 52

*Rajamin v. Deutsche Bank Nat'l Trust Co.,*
757 F.3d 79 (2d Cir. 2014) .................................................................. 69

*Rales v. Blasband,*
634 A.2d 927 (Del. 1993) ................................................................ 21, 22

*Rosenthal v. Burry Biscuit Corp.,*
60 A.2d 106 (Del. Ch. 1948) ................................................................ 54

*Scalisi v. Fund Asset Mgmt., L.P.,*
380 F.3d 133 (2d Cir. 2004) ................................................................ 21

*SEC v. Universal Express, Inc.,*
475 F. Supp. 2d 412 (S.D.N.Y. 2007) .................................................. 57

*Seminaris v. Landa,*
662 A.2d 1350 (Del. Ch. 1995) ....................................................... 22, 47

*Shaw v. Digital Equip. Corp.,*
82 F.3d 1194 (1st Cir. 1996) ............................................................... 37

*Siegert v. Gilley,*
500 U.S. 226 (1991) ............................................................................ 31

*Simmonds v. INS,*
326 F.3d 351 (2d Cir. 2003) .......................................................... 63, 64

*Simons v. Cogan,*
549 A.2d 300 (Del. 1988) .................................................................... 56

*Smith v. Stevens,*
  957 F. Supp. 2d 466 (S.D.N.Y. 2013) ....................................................54

*Sonkin v. Barker,*
  670 F. Supp. 249 (S.D. Ind. 1987) ....................................................67

*Stone v. Ritter,*
  911 A.2d 362 (Del. 2006)....................................................27, 28

*Telxon Corp. v. Meyerson,*
  802 A.2d 257 (Del. 2002)....................................................49

*Treadway Cos. v. Care Corp.,*
  638 F.2d 357 (2d Cir. 1980) ....................................................23

*United States v. Catoggio,*
  698 F.3d 64 (2d Cir. 2012) ....................................................64

*United States v. Fell,*
  360 F.3d 135 (2d Cir. 2004) ....................................................67

*Wood v. Baum,*
  953 A.2d 136 (Del. 2008)....................................................28, 30

## Statutes, Rules and Regulations

15 U.S.C. § 77e....................................................57

17 C.F.R. § 210.3-12....................................................33

17 C.F.R. § 229.303....................................................16

17 C.F.R. § 230.408....................................................17

17 C.F.R. § 243.100....................................................44

28 U.S.C. § 1291....................................................4

28 U.S.C. § 1331....................................................4

28 U.S.C. § 1332....................................................4

Del. Code tit. 8, § 102 ....................................................28

x

Del. Code tit. 8, § 327 ...............................................................50

Fed. R. Civ. P. 23.1 ........................................................ passim

Fed. R. Civ. P. 54 ......................................................................66

## Other Authorities

Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and the Securities Laws* (4th ed. 2012 Supp.)................................9

David A. Westenberg*, Initial Public Offerings: A Practical Guide to Going Public* (PLI Sept. 2011) ...............................................9

# INTRODUCTION

This is one of seven derivative cases filed in the aftermath of Nominal Defendant-Appellee Facebook, Inc.'s Initial Public Offering ("IPO") that challenged Facebook's disclosures in its IPO filings. The District Court dismissed all of them, finding that none of the plaintiffs, including Plaintiff-Appellant Robert Crocitto, pleaded threshold derivative standing requirements or claims ripe for adjudication. There are four appeals of these dismissals currently pending before this Court. In this one, Crocitto challenges each of the three independent grounds for dismissal: demand futility, contemporaneous share ownership, and ripeness. The other derivative plaintiffs raise overlapping issues and also argue that the District Court should have remanded their cases to state court without addressing dismissal at all.[1] In this case, because there is no remand issue, each of the dismissal grounds is indisputably presented for this Court's review.

To establish derivative standing, Crocitto was required to allege both that a demand on the Board of Directors would have been futile

---

[1] Facebook filed the motions to dismiss the derivative actions, which were limited to threshold grounds. All defendants, including Facebook, reserved the right to respond to the complaints on the merits if necessary.

and that he owned stock at the time of the alleged misconduct.  *See* Fed. R. Civ. P. 23.1.  He failed on both scores.

As to demand, the District Court did not abuse its discretion in finding that Crocitto failed to meet demand futility's heightened pleading standard—namely, alleging particular facts showing that a majority of directors could not impartially consider a demand because they either engaged in knowing misconduct sufficient to create a "substantial threat of personal liability" or were not "independent" of directors who faced such liability.

Crocitto argues he met that standard by relying primarily on the District Court's decision refusing to dismiss the securities action that followed Facebook's IPO.  But in that decision, the District Court ruled only that securities plaintiffs adequately pleaded disclosure violations under Sections 11 and 12 of the Securities Act of 1933.  That ruling does not in any way indicate the knowing violation of law necessary for the directors to face a substantial threat of derivative liability.  Nor can such knowledge be inferred from the District Court's ruling, which the District Court itself recognized imposed a novel disclosure obligation and contradicted precedential authority.  In affirming that demand was

2

not futile, this Court should hold that the District Court's ruling in the securities action provides no basis for excusing demand because an issuer need not disclose either mid-quarter revenue information in the absence of an extreme departure from reported results or revenue projections. Accordingly, Crocitto did not plead *any* violation of securities law, much less a knowing one.

Independently, the District Court correctly ruled that Crocitto failed to allege that he owned Facebook stock at the time of the IPO. As Crocitto acknowledged, he merely owned units of an investment fund that in turn owned Facebook stock. The District Court recognized this was insufficient to meet the narrow circumstances in which a plaintiff can establish derivative standing as an "equitable" owner of a company's stock.

Finally, the District Court properly held that none of Crocitto's claims is ripe because they are all premised upon injuries that will arise only if the Company is ultimately held liable in the ongoing securities litigation.

## STATEMENT OF JURISDICTION

The statement of jurisdiction in Crocitto's Opening Brief is accurate. The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1332. Crocitto timely appealed from the District Court's April 22, 2014 final judgment, JA264, on April 23, 2014. JA272. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the District Court abused its discretion in concluding that Crocitto failed to adequately plead demand futility under Rule 23.1.

2. Whether the District Court erred in concluding that Crocitto failed to adequately allege contemporaneous share ownership under Rule 23.1.

3. Whether the District Court erred in concluding that this case is not ripe until the securities litigation has been resolved.

## STATEMENT OF THE CASE AND THE FACTS

Facebook's pre-IPO Registration Statement repeatedly disclosed the challenges posed by the increasing use of Facebook on mobile devices. In particular, it disclosed that Facebook did "not currently directly generate any meaningful revenue" from mobile usage, and that

4

the Company's "revenue would be negatively affected" if it is "unable to successfully implement monetization strategies for our mobile users." Final S-1 at 14, 51.[2]  Also, as part of the underwriting process, on April 16, 2012, Facebook gave its underwriters revenue projections for the second quarter and full year of 2012.   Three weeks later, on May 9, 2012, Facebook filed a one-page, stand-alone disclosure, known as a "Free Writing Prospectus," stating that ads delivered were not increasing as fast as users, in part because of increased mobile usage. Concurrently, Facebook shared revised revenue projections with its underwriters, predicting modestly slower short-term revenue growth. Ultimately, Facebook's revenue growth did not slow as predicted in the revised projections, and revenue from mobile advertisements now accounts for over 60% of total advertising revenue.[3]   Facebook's stock

---

[2]   The Registration Statement on Form S-1 ("Final S-1") is in the record, No. 12-md-2389, Dkt. 25-5, and is also available at https://www.sec.gov/Archives/edgar/data/1326801/0001193125122355 88/d287954ds1a.htm.

[3]   Facebook's Form 10-Q Disclosure, at 29 (July 24, 2014), http://files.shareholder.com/downloads/AMDANJ5DZ/2705274084x0x S1326801-14-32/1326801/filing.pdf.   This Court routinely takes judicial notice of public securities filings.  *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 481 (2d Cir. 2011) ("rely[ing] on information derived from … filings with the" SEC).

now trades at approximately double the $38 per share offering price, rewarding investors who heeded the Company's warning that its stock was best suited as a long-term investment.  Final S-1 at 81-82.

Nevertheless, after NASDAQ fumbled early trading and Facebook's stock price fell in the immediate aftermath, plaintiffs filed dozens of lawsuits, including derivative actions such as this one, alleging that Facebook's Registration Statement was inadequate because it did not disclose the mid-quarter effect of increasing mobile usage on Facebook's projected revenue growth.

## A.    Facebook Disclosed Risks Related To Mobile Use.

Facebook's Registration Statement contained historical data about Facebook's performance and described the risk that users were increasingly accessing Facebook through mobile devices, from which Facebook did not then generate any meaningful revenue.  At that time, Facebook did not yet know whether its monetization strategy would succeed.  The Registration Statement thus disclosed risks associated with mobile monetization *nine* times.  *See* Final S-1 at 5, 13, 14-15, 16, 51, 53, 57, 93, 94.

For example, a section entitled "Summary Risk Factors" highlighted that "[g]rowth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results." *Id.* at 5 (emphasis omitted). Facebook explained:

> [W]e anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future .... [W]e do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered. If users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected.

*Id.* at 14-15. Facebook disclosed that it "believe[d] that people around the world will continue to increase their mobile usage of Facebook, and that some of this mobile usage has been and will continue to be a substitute for use of Facebook through personal computers." *Id.* at 51. It even emphasized that it was attempting *to increase* mobile usage despite not generating meaningful revenue at the time. *Id.* at 50, 57.

7

On May 9, 2012—just 8 days before the IPO—Facebook issued a Free Writing Prospectus emphasizing that trends related to increased mobile usage were continuing and that Facebook still had not monetized mobile usage:

> Based upon our experience in the second quarter of 2012 [which began on April 1, 2012] to date, *the trend we saw in the first quarter of [Daily Active Users] increasing more rapidly than the increase in number of ads delivered has continued*. We believe *this trend is driven in part by increased* usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

JA153 (Am. Compl. ¶38) (emphasis added).  After the Free Writing Prospectus was filed, Facebook's Treasurer telephoned analysts at the Company's underwriters to make sure they had seen the amended filing, and to inform them that, "based upon the trends we described in the [Free Writing Prospectus]," "we believe we are going to come in [on] the lower end" of the $1.1 to 1.2 billion April projection for second quarter revenue, and may come in 3 to 3.5 percent less than the $5 billion April projection for 2012.  *In re Facebook, Inc., IPO Sec. & Deriv.*

*Litig.*, 2013 WL 6798160, at \*6 (S.D.N.Y. 2013) ("*Derivative Opinion II*"

or "*Deriv. Op. II*").[4]

The underwriters consequently updated their own models and

shared them with certain institutional investors, *id.*, which is a normal

part of the IPO price discovery process:

> Following the Facebook IPO in 2012, the financial press criticized the underwriters for providing reduced estimates to institutional customers but not retail customers. The criticism is baseless since the 'clearing price' for the IPO will be established on the basis of what the institutional customers are willing to pay for the IPO shares. Having received earlier estimates, the institutional customers should of course receive any updated estimates. Since retail investors do not participate in the price discovery process, they do not need to receive estimates (or, by definition, any updated estimates).

Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and*

*the Securities Laws* § 3.04[A][6] (4th ed. 2012 Supp.).

---

[4]  As is standard IPO practice, Facebook disclosed both its initial and revised revenue projections to its underwriters. *See* David A. Westenberg*, Initial Public Offerings: A Practical Guide to Going Public* § 19:7.2[B] (PLI Sept. 2011) (proper IPO preparation includes "discussions with management concerning the company's financial model" so analysts can "develop earnings forecasts"). Underwriters use these to develop their own forecasts that they provide to clients, as this "assists in the price discovery process." Johnson & McLaughlin, *supra* § 3.04[A][6].

Facebook's revised projections turned out to be too conservative: Facebook reported second quarter revenue of $1.184 billion (near the *upper* end of the original $1.1 to $1.2 billion range) and 2012 revenue of $5.089 billion (above both the original projection of $5 billion and the revised projection).[5]

## B.    Dozens of Lawsuits Are Filed After Facebook's IPO.

Facebook stock began public trading on May 18, 2012, after the initial public offering at $38 per share.  Unfortunately, massive trading errors by NASDAQ's system created widespread market confusion, prompting a sell-off and significantly affecting the market's view of the offering.  The slow start prompted dozens of lawsuits, all quoting news articles published after the first day of trading that repeated pre-IPO reports that Facebook had shared lowered revenue projections with the underwriters shortly before the IPO.  *See, e.g.*, *Cole v. Zuckerberg*, No. 12-cv-7549, Dkt. 1-1, Compl. ¶¶51-53.

---

[5]    *See* Facebook's Form 10-Q Disclosure, at 5 (July 31, 2012), http://www.sec.gov/Archives/edgar/data/1326801/000119312512325997/d371464d10q.htm; Facebook's Form 10-K Disclosure, at 34 (Feb. 1, 2013),www.sec.gov/Archives/edgar/data/1326801/000132680113000003/fb-12312012x10k.htm.

Dozens of lawsuits were filed under Sections 11 and 12 of the Securities Act of 1933 and were later consolidated into a single class action ("the Securities Action"). Seven other actions were filed as shareholder derivative suits. A third group of lawsuits was filed against NASDAQ for losses caused by its trading errors. On October 4, 2012, the Judicial Panel on Multidistrict Litigation ("JPML"), transferred all these cases to the Southern District of New York for consolidated or coordinated pre-trial proceedings. *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 899 F. Supp. 2d 1374 (J.P.M.L. 2012).

All of the derivative actions are substantially identical, alleging that Facebook's directors breached duties because Facebook's Registration Statement did not include a sufficient description of the effect increasing mobile usage was projected to have on revenue growth. Several of the derivative actions, including this one, relied on a director oversight theory of liability; others also alleged that three directors' IPO sales of Facebook stock amounted to insider trading.

The first derivative action was filed in the Southern District of New York by Edward Childs. *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 449 (S.D.N.Y. 2013) ("*Derivative Op. I*" or

11

"*Deriv. Op. I*").  The next derivative actions were filed in California Superior Court by William Cole, Hal Hubuschman, and Linda Levy, and were removed and transferred to the Southern District of New York.  *Id.*  This action was filed on February 4, 2013 in the Southern District of New York on Crocitto's behalf by the same counsel who had filed *Childs*, and using the *Childs* complaint's language almost verbatim—except that Crocitto alleged equitable, not actual, ownership of Facebook stock prior to the IPO.  Crocitto then filed an amended complaint that explicitly relied on the District Court's decision denying the motion to dismiss the Securities Action.  JA143-263.

Two additional actions were filed on March 1, 2013 in the Delaware Court of Chancery by Gaye Jones and Holly McConnaughey. *Deriv. Op. II*, 2013 WL 6798160, at *2.  That court consolidated the cases, designating *Jones* as the operative complaint.  *Id.  Jones* was also substantially identical to the other derivative complaints, although it purportedly contained new allegations in response to *Derivative Opinion I.  Id.* at *23.  In addition to Facebook's directors, *Jones* named certain Facebook officers and the lead underwriters for the IPO as

12

defendants. *Id.* at *8. *Jones* was also removed and transferred to the Southern District of New York. *Id.* at *1.

## C. The District Court's Decisions Dismissing The Other Derivative Actions.

The District Court issued two opinions in the derivative suits.

*1. <u>Derivative Opinion I</u>*: On February 13, 2013, the District Court dismissed *Cole*, *Hubuschman*, *Levy*, and *Childs* on three independent threshold grounds. *Deriv. Op. I*, 922 F. Supp. 2d 445. It first determined that it had discretion to consider threshold grounds for dismissal before deciding the remand motions that were pending in three of the four cases, and that considerations of judicial economy warranted doing so. *Id.* at 453-55. It then found that plaintiffs failed to satisfy two requirements for derivative standing: contemporaneous share ownership and pre-suit demand. The derivative plaintiffs did not adequately allege that they owned Facebook stock at the time of the alleged misconduct because they bought the stock after the IPO. *Id.* at 467. And they failed to allege a particularized basis for excusing demand because they could not show that the directors faced a substantial likelihood of liability for "allow[ing] Facebook to file a Registration Statement that did not disclose its internal revenue

13

projections." *Id.* at 472. The District Court recognized that courts "uniformly agreed" that revenue projections need not be disclosed and found that the plaintiffs failed to plead any facts demonstrating the directors "knew" that the Registration Statement was legally insufficient at the time they signed it. *Id.* at 472-73. The District Court also found that plaintiffs' claims were not ripe because they depended on Facebook incurring liability in the ongoing Securities Action. *Id.* at 473-74. It denied a fourth ground raised in *Cole, Hubuschman*, and *Levy* that a forum selection clause required dismissal, and denied as moot those plaintiffs' remand motions.

The District Court granted plaintiffs leave to replead within twenty days. *Id.* at 475. The parties (along with Crocitto) thereafter stipulated to stay proceedings pending the outcome of the motion to dismiss the Securities Action. *Deriv. Op. II*, 2013 WL 6798160, at *1-2.

2. *Derivative Opinion II*: On December 23, 2013, the District Court dismissed the *Jones* complaint on the same three grounds as in *Derivative Opinion I*, finding that *Jones* failed to plead around that decision. *Deriv. Op. II*, 2013 WL 6798160. The District Court again exercised its discretion to consider first threshold grounds for dismissal.

14

*Id.* at \*8-11.  It found that Jones's pre-IPO ownership of units in a fund called "SharesPost" that held Facebook stock—which are the same type of units that Crocitto owned, JA146 (Am. Compl. ¶10)—did not satisfy Jones's obligation to allege contemporaneous ownership of Facebook stock.  *See Deriv. Op. II*, 2013 WL 6798160, at \*14-16.  The District Court also found that, notwithstanding its denial of the motion to dismiss the Securities Action, the directors did not face a substantial risk of personal liability in the derivative actions because the plaintiffs did not sufficiently allege either that the directors knew the Registration Statement was legally defective, or that the timing or amount of three directors' stock sales in the IPO was suspicious.  *Id.* at \*19.  Finally, the District Court determined the case was unripe because it was again premised on Facebook's potential liability in the ongoing Securities Action.  *Id.* at \*23.  The District Court denied as moot Jones's remand motion, *id.* at \*25, and entered final judgment on January 30, 2014.  No. 12-md-2389, Dkt. 196.

### D.    The District Court's *Securities Decision.*

On December 12, 2013, the District Court denied a motion to dismiss the Securities Action.  *In re Facebook, Inc., IPO Sec. & Deriv.*

*Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013) ("*Securities Decision*"). The District Court ruled that plaintiffs sufficiently alleged that it was misleading for Facebook to warn that mobile usage would have a negative impact on future revenues under certain conditions, when a negative impact allegedly "had already materialized" during the quarter in progress. *Id.* at 516. Misreading *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011), and *Panther Partners Inc. v. Ikanos Comm'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012), the District Court also held that Item 303 of Regulation S-K requires issuers to disclose not only "known trends" that they reasonably expect to have a material impact on revenues, as is required by the Regulation's text, *see* 17 C.F.R. § 229.303(a)(3)(ii), but also the "*extent*" to which such trends "ha[ve] impacted or [are] expected to impact future revenues" for the quarter in progress. *Securities Decision*, 986 F. Supp. 2d at 511 (emphasis added). Finally, the District Court held that plaintiffs sufficiently alleged that Facebook's disclosures were materially incomplete under Rule 408 of SEC Regulation C, 17 C.F.R. § 230.408(a), also because Facebook did not sufficiently disclose that mobile usage had already affected revenue for the quarter in progress. *Securities Decision*, 986 F. Supp. 2d at 522.

16

### E.     The District Court's Decision Dismissing This Action.

On April 17, 2014, after the *Securities Decision*, Crocitto amended his complaint to incorporate, and thus preserve for his appeal, the allegations made by the securities plaintiffs and Jones, namely, that the Registration Statement did not disclose the impact mobile usage was already having on revenues.     JA160-61 (Am. Compl. ¶¶56-59). Facebook moved to dismiss, and Crocitto stipulated to entry of judgment because he recognized "the basis for the Derivative Opinion I and the Derivative Opinion II, as both opinions currently stand would require dismissal of the Crocitto Amended Complaint." JA266.     On April 22, 2014, the District Court entered judgment dismissing *Crocitto,* "for the reasons stated in Derivative Opinion I, Derivative Opinion II, and in the April 17, 2014 Stipulation and Order." JA264.  On April 23, 2014, Crocitto appealed.     JA272.     In the same stipulation, Cole, Hubuschman, and Levy likewise consented to entry of a judgment based on prior rulings.  JA266.

17

## F.    The Derivative Appeals.

There are four overlapping appeals relating to five of the derivative actions now pending in this Court.[6]   This appeal is based on the dismissal of *Crocitto* for the reasons stated in *Derivative Opinion I* and *Derivative Opinion II*.   JA264.   An appeal in *Jones* is separately pending under docket, 14-632-cv.   Appeals in *Cole* and *Levy* have been consolidated under docket, 14-1445-cv.

## STANDARD OF REVIEW

The standard of review set forth in Crocitto's Opening Brief is accurate.   This Court reviews de novo dismissals based on failure to adequately plead contemporaneous share ownership, *see In re Bank of New York Deriv. Litig.*, 320 F.3d 291, 297 (2d Cir. 2003), and lack of ripeness, *see Connecticut v. Duncan*, 612 F.3d 107, 112 (2d Cir. 2010), and it reviews for abuse of discretion a dismissal for failure to plead demand futility under Rule 23.1 where, as here, the "determination of the sufficiency of allegations of futility depends on the circumstances of

---

[6]   *Childs* has been voluntarily dismissed, 12-md-2389, Dkt. 215; *Hubuschman* was not appealed; and *McConaughey* is consolidated with *Jones*, JA81.

the individual case." *Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009) (internal quotation omitted).

## SUMMARY OF ARGUMENT

The District Court properly dismissed Crocitto's complaint for failure to adequately plead demand futility, contemporaneous share ownership, or ripeness. This Court should affirm on all three grounds, any one of which is sufficient to sustain the judgment below.

*First,* the District Court properly found that the complaint failed to excuse demand. Crocitto was required to adequately allege that a majority of the directors either (1) engaged in intentional misconduct sufficient to create a "substantial threat of personal liability" or (2) "[we]re compromised in their ability to act independently of the interested directors." *Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007). Crocitto's claim that the directors face a substantial threat of liability fails because it is based on alleged obligations to disclose a mid-quarter revenue impact and forward-looking projections that courts have repeatedly rejected. And Crocitto's allegations that various directors are unable to act independently of Mr. Zuckerberg conflict with well-established Delaware law holding that directors are

19

presumptively able to act independently from majority shareholders, even those with whom they regularly conduct business. *See, e.g.*, *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051-53 (Del. 2004).

*Second*, Crocitto failed to establish contemporaneous ownership of Facebook stock, because he alleged that he owned units of a "SharesPost" fund—not shares of Facebook stock—at the time of the IPO. The agreements governing that fund made clear that, at the time of the IPO, Crocitto "ha[d] no direct interest in any Facebook Securities" and SharesPost had discretion never to distribute Facebook shares to Crocitto. JA219 (Subscription Agmt. § 3(m)). Under Delaware law, such a conditional possibility of receiving stock is insufficient to establish even "equitable" ownership of Facebook stock.

*Finally*, Crocitto's claims are not ripe because they depend on whether Facebook is found liable in another, ongoing proceeding.

## ARGUMENT

## I.  The District Court Did Not Abuse Its Discretion In Finding That Crocitto Failed To Plead Demand Futility.

Crocitto's complaint failed on the "threshold question of standing as to … whether the shareholder has made a demand on the board of

20

directors." *Fink v. Weill*, 2005 WL 2298224, at *3 (S.D.N.Y. 2005). When no demand is made, Rule 23.1 requires the plaintiff to "state with particularity ... the reasons for ... not making the effort." Fed. R. Civ. P. 23.1(b)(3). The adequacy of those reasons is determined by the law of Delaware, Facebook's state of incorporation. *See Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004). "Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, 534 F.3d 779, 782-83 (D.C. Cir. 2008). This is not one of those situations.

Crocitto argues that in determining whether demand is excused, this Court may apply *either* the exception to the demand requirement defined in *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993), or the one set forth in *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). But it is well established that the *Rales* test is employed where directors allegedly "have failed to do something," 634 A.2d at 934 n.9, and like the other derivative complaints, *see Deriv. Op. I*, 922 F. Supp. 2d at 472; *Deriv. Op. II*, 2013 WL 6798160, at *19, the crux of Crocitto's complaint is that the Board failed to exercise proper oversight—so-called

21

"*Caremark*" liability—and ensure that the Registration Statement had adequate disclosures.  JA145, JA154, JA165-67 (Am. Compl. ¶¶5-6, 44, 79, 80, 83); *see also* Opening Br. 16 (alleging "failures to act").  To such claims, courts apply the one-prong *Rales* exception.  S*ee Louisiana Mun. Police Employees' Ret. Sys. v. Hesse*, 962 F. Supp. 2d 576, 588 (S.D.N.Y. 2013); *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

To excuse demand, *Rales* requires a plaintiff to offer "particularized factual allegations" that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  634 A.2d at 934.  Thus, a plaintiff must show that a majority of directors either (1) "face a sufficiently substantial threat of personal liability as to the conduct alleged in the complaint," and are thus "interested" in this lawsuit, or (2) "are compromised in their ability to act independently of the interested directors."  *Desimone*, 924 A.2d at 928 (citing *Rales*).  The District Court did not abuse its discretion in finding that Crocitto's complaint failed to

22

make this difficult showing. *See Deriv. Op. I*, 922 F. Supp. 2d at 468; *Deriv. Op. II*, 2013 WL 6798160, at *18-20.[7]

### A. The District Court Did Not Abuse Its Discretion In Finding Inadequate Crocitto's Allegations That Directors Were Interested In This Litigation.

Crocitto makes two arguments that the directors' interest in this litigation excused demand: *first,* he argues that three directors are "interested" because they profited by selling shares in the IPO while in possession of purportedly material non-public information, *see* Opening Br. 11-12; *second,* he contends that all the directors face a "substantial

---

[7] The District Court also correctly found that the derivative allegations did not satisfy the *Aronson* test, *see Deriv. Op. I*, 922 F. Supp. 2d at 468; *Deriv. Op. II*, 2013 WL 6798160, at *21, of creating a reasonable doubt that either (1) "the directors are disinterested and independent" or (2) "the challenged transaction was ... the product of a valid exercise of business judgment," *Aronson*, 473 A.2d at 814. The first prong is equivalent to the *Rales* test. *See DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *29 (Del. Ch. 2013). And Crocitto's complaint contains no particularized allegations that the Board made a specific business decision that was not a valid exercise of business judgment. *See Aronson*, 473 A.2d at 814. Crocitto's allegation that "*Facebook employees* <u>selectively</u> disclosed internal projections" to underwriters (Opening Br. 17 (first emphasis added)) does not come close to showing that the directors on the Board engaged in "a transaction [that is] so egregious on its face that board approval cannot meet the test of business judgment." *Id.* at 815; *see also Treadway Cos. v. Care Corp.*, 638 F.2d 357, 382 (2d Cir. 1980) (plaintiff must allege particularized facts demonstrating that directors "engaged in self-dealing or fraud, or … acted in bad faith").

threat of personal liability" in *this suit* because they allowed the Company to file a registration statement that was defective for the reasons stated in the *Securities Decision*, *see id.* at 13-14.    Neither argument has merit.

> **1.**    **The District Court Did Not Abuse Its Discretion In Ruling That The Alleged Stock Sales Did Not Render Any Director Interested in This Lawsuit.**

Crocitto initially argues that Zuckerberg, Breyer, and Thiel (the "Selling Directors") could not objectively consider a demand because, by selling shares in the IPO, they "received a benefit not shared by the other stockholders."    Opening Br. 11-12.    But Delaware courts have rejected the claim that "because each [director] traded stock ... each supposedly had a personal 'interest' in a challenged transaction that is separate from [the Company's]."    *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003); *see also In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *14 n.88 (Del. Ch. 2010).    As the District Court recognized, *Deriv. Op. I*, 2013 WL 6798160, at *21, *Guttman* explained that the rule (upon which Crocitto relies, *see* Opening Br. 12 n.5) that directors are "interested" in a transaction if they benefit separately from all shareholders was "designed to fit classic self-dealing transactions" in

which the director "is on the other side of the transaction from the corporation." *Guttman*, 823 A.2d at 502. By contrast, because corporate insiders in an IPO sell company stock to *outsiders* "[a]s a matter of course," such sales are not presumptively illegal, and thus do not by themselves render a director "interested" in a lawsuit challenging such sales. *Id.*; *see also In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *7 (S.D.N.Y. 2006) ("[e]arly [i]nvestors and [p]romoters routinely sell stock in IPOs").

Rather, a plaintiff who seeks to excuse demand based on director stock trading must plead "particularized facts regarding the directors that create a sufficient likelihood of personal liability" based on the trades. *Guttman*, 823 A.2d at 502; *accord In re Forest Labs. Inc. Deriv. Litig.*, 450 F. Supp. 2d 379, 389 (S.D.N.Y. 2006). While Crocitto faults the Selling Directors for selling shares while in possession of purportedly material non-public information, Opening Br. 11, his complaint does not allege that those trades were illegal. Nor could he. As discussed *infra*, there was no duty to disclose either revenue projections or mid-quarter revenue information, *see infra* Section I.A.2, and as demonstrated in Facebook's *Jones* Response Brief Section

25

III.A.1, there is also no basis for scienter allegations because insiders routinely sell stock in IPOs without disclosing such information. Likewise, Crocitto cannot allege scienter by pointing to events that typically occur in IPOs, such as sharing projections "with the underwriters and large institutions" or raising the "price of shares in the IPO." Opening Br. at 12; *see* Jones Response Br. Section III.A.1.

>    **2.    The District Court Did Not Abuse Its Discretion In Ruling That Crocitto Did Not Adequately Allege That Directors Knowingly Violated Disclosure Obligations.**

Crocitto next argues that the District Court's refusal to dismiss the Securities Action shows that directors face a substantial likelihood of personal liability. Opening Br. 13. To support this claim, Crocitto's complaint quotes liberally from the *Securities Decision*, JA159-61 (Am. Compl. ¶¶55-60), asserting that because the *Securities Decision* found that securities plaintiffs adequately pled claims under the Securities Act, the directors breached fiduciary duties by allowing Facebook to file the Registration Statement. That conclusion does not follow. Section 11 of the Securities Act imposes liability for any material misrepresentations or omissions in a Registration Statement without regard to intent, whereas Crocitto brought failure of oversight

26

"*Caremark*" claims, which under Delaware law are based on "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

*Caremark* claims require a showing "that the directors *knew* that they were not discharging their fiduciary obligations," either because "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis added).  It is plainly insufficient for Crocitto merely to adopt the *Securities Decision* in his complaint, because the securities plaintiffs "specifically disclaim[ed] any allegation of fraud, scienter, or recklessness in these non-fraud Securities Act claims." Consol. Class Action Compl., *Securities Action*, 12-MD-2389, Dkt. 71, ¶3.

As the District Court recognized, to plead a "substantial likelihood of liability," Crocitto had to "allege particularized facts showing that the

27

Director Defendants 'knew' that not disclosing was illegal." *Deriv. Op. II*, 2013 WL 6798160, at \*19 (citing *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008)). Indeed, that requirement is reinforced in this case because Facebook's Certificate of Incorporation contains a Section 102(b)(7) provision "exculpat[ing] directors from monetary liability for a breach of the duty of care." *Stone*, 911 A.2d at 367; *see* Del. Code tit. 8, § 102(b)(7); *see also In re Citigroup Inc. S'holder Deriv. Litig.,* 964 A.2d 106, 124-25 (Del. Ch. 2009) ("In either case [in assessing liability for a *Caremark* claim or a non-exculpated claim], a plaintiff can show that the director defendants will be liable if their acts or omissions constitute bad faith.").[8] Even Crocitto acknowledges that he must show the directors "'*consciously* caus[ed] the corporation to violate the law.'" Opening Br. 16 (quoting *Desimone*, 924 A.2d at 934) (emphasis added).

The *Securities Decision* does not address, let alone satisfy, that pleading standard. To the contrary, even the author of the *Securities Decision* acknowledged that it was based on novel legal theories. *See In*

---

[8] Facebook's Certificate of Incorporation reads, "To the fullest extent permitted by law … no director of the corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." No. 12-md-2389, Dkt. 25-2, Sec. VII.

*re Facebook, Inc. IPO Sec. & Deriv. Litig.,* 986 F. Supp. 2d 524, 541-44 (S.D.N.Y. 2014) ("*Interlocutory Appeal Decision*") (denying leave to appeal the *Securities Decision*, but recognizing that the decision's misrepresentation ruling was subject to "conflicting authority" and "a substantial ground for difference of opinion," and that its interpretation of SEC regulations also addressed "a question of first impression"); *Deriv. Op. II*, 2013 WL 6798160, at *19 (derivative plaintiffs failed to plausibly allege that the directors knew the Company's pre-IPO disclosures were inadequate). In such circumstances, there is no plausible basis for inferring that the directors *knowingly* caused the Company to violate federal securities law. *See, e.g.*, *Hesse*, 962 F. Supp. 2d at 587 ("Knowledge of the tax strategy alone, which only implies Sprint differed in its interpretation of the tax code from the New York authorities, does not lead to a reasonable inference the Directors intentionally engaged in misconduct.").

Courts applying Delaware law have repeatedly recognized that a plaintiff cannot show that directors "knowingly and intentionally violated the law and, in turn, face personal liability," unless prior law was unambiguous and settled. *Id.* at 585-86, 589 (no substantial risk of

29

liability, even though the company lost a motion to dismiss in a lawsuit over the legality of its tax plan, because the complaint failed to "demonstrate [that] Defendants knew the company was pursuing an 'illegal' tax strategy, as opposed to a 'risky' tax strategy"); *see also Wood*, 953 A.2d at 141-42 (dismissing where "the Complaint alleges many violations of federal securities and tax laws but does not plead ... that the defendants knew that such conduct was illegal"); *Harold Grill 2 IRA v. Chenevert*, 2013 WL 3014120, at *3 (Del. Ch. 2013) (no substantial threat of liability where plaintiffs failed to adequately allege that "any particular director should have known that the disclosures were false, much less plead facts supporting a pleading stage inference of actual knowledge"), *aff'd*, 83 A.3d 737 (Del. 2013) (affirming "for the reasons assigned by the Court of Chancery").

Moreover, in holding that plaintiffs had adequately alleged a claim under Section 11 of the Securities Act, the *Securities Decision* was both novel and incorrect. As discussed below, the *Securities Decision* incorrectly held that, as alleged, (1) Facebook's warning that increased mobile usage "may" harm future revenue misleadingly implied that mobile usage was not having any effect on the quarter in progress; and

30

(2) SEC regulations required the Company to disclose the mid-quarter and projected revenue impacts of increased mobile usage. In these circumstances, this Court can and should affirm on the ground that the directors do not face a substantial risk of liability because there was no violation of federal securities law, much less a knowing one. *Cf. Siegert v. Gilley*, 500 U.S. 226, 232, 234 (1991) (because "[a] necessary concomitant to the determination of whether the [law] is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of [law] at all," the court may affirm the lower court's ruling "[b]y a different line of reasoning").

### a. Facebook's Warnings About The Risks of Mobile Usage Were Not Misleading.

The *Securities Decision* ruled that the securities plaintiffs adequately alleged that Facebook's warning that mobile usage "may" affect its future revenue results misleadingly implied that an effect on revenue from increased mobile usage had not "already materialized" during the first several weeks of the quarter in progress. *Securities Decision*, 986 F. Supp. 2d at 516. Because that ruling is erroneous as a matter of law, Crocitto cannot rely on it.

31

The *Securities Decision* conflicts with *this Court's* prior decisions holding that merely warning that a trend "may" affect revenue does not misleadingly imply that the trend is not already affecting revenues being earned in the quarter in progress. *DeMaria v. Andersen* 318 F.3d 170 (2d Cir. 2003), held that when a prospectus warned that the issuer "*may* incur operating losses in the future," even though unreported first quarter losses were known at the time of the IPO, it "can hardly be said that, by having not been explicitly told of the company's actual first quarter losses, a reasonable investor would have been misled." 318 F.3d 170, 181-82 (2d Cir. 2003) (internal quotations omitted; emphasis added) (citing *In re N2K Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y.), *aff'd* "on the opinion of [the District Court]," 202 F.3d 81 (2d Cir. 2000) (per curiam).) Similarly, *In re N2K* rejected a claim that it was misleading to state that "it is possible that in some future quarter or quarters the Company's operating results will be below the expectations of securities analysts," when in fact "N2K's financial results [for the recently-completed unreported quarter] *were* below analysts' expectations." 82 F. Supp. 2d at 209 (emphasis in original). Several district courts have applied these precedents to dismiss claims that

32

cautionary statements about future revenue, which are "ubiquitous in securities filings," *In re FBR Inc. Sec. Litig.,* 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008), imply an absence of any effect in the quarter in progress.[9]    These courts have reasoned that a contrary ruling would amount to "an end-run around" the SEC's disclosure regime by requiring "instantaneous disclosure out[side] of the normal reporting period[]" of the impact of each of the many warned-of risks.    *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2010) (internal quotations omitted).    SEC regulations state a company need not disclose mid-quarter revenue information for the period in which an IPO is held or, for that matter, for fiscal quarters that were completed within 45 days of an IPO.    *See* Regulation S-X, 17 C.F.R. § 210.3-12(a).

Even assuming a warning that a trend "may" affect future reported revenue could *in some cases* be read to imply that the trend was not currently affecting revenues during the quarter in progress, Facebook's Registration Statement is susceptible to no such reading.

---

[9]    *See also In re Noah Educ. Holdings Ltd. Sec. Litig.*, 2010 WL 1372709, at *7-8 (S.D.N.Y. 2010) (when prospectus said "could," the "forward-looking recitation of risks facing [Defendant] did not imply that none of these risks … would affect [Defendant's] most recent [unreported] fiscal quarter").

Facebook's warnings about the potential impact of mobile usage on future revenue results did not imply that revenue in the partial, unreported second quarter was unaffected.  Facebook disclosed that its "financial performance and ability to grow revenue *would* be negatively affected" by increased mobile usage *if*: (1) "users increasingly access Facebook mobile products as a substitute for access through personal computers," and (2) the Company is "unable to successfully implement monetization strategies for our mobile users."   Final S-1 at 14 (emphasis added).   And Facebook disclosed that those two conditions were *currently* occurring.  *See id.* at 51 ("some of this mobile use *has been*, and will continue to be, a substitute for use of Facebook through personal computers") (emphasis added); *id.* at 14 ("we do not *currently* directly generate any meaningful revenue from the use of Facebook mobile products") (emphasis added).  Facebook also provided historical data showing the continuing increase in mobile usage, Final S-1 at 49-50, and even highlighted in the Free Writing Prospectus that users were continuing to increase faster  than ad delivery—a trend Facebook attributed in part to use of Facebook on mobile devices, where the

34

Company did not show a material number of ads.  JA153 (Am. Compl. ¶38).

> b.  Facebook's Registration Statement Did Not Improperly Omit Mid-Quarter Revenue Information.

Crocitto also relies on the *Securities Decision*'s holding that two SEC regulations required Facebook to disclose the extent to which increased mobile usage was allegedly already affecting revenue in the quarter in progress.  JA159-61 (Am. Compl. ¶¶53-58).  This ruling, too, is erroneous as a matter of law.  The *Securities Decision* held that Item 303, a regulation that requires disclosure of "known trends," also requires issuers to disclose the "*extent*" to which such trends "ha[ve] impacted or [are] expected to impact" revenues for a quarter in progress.  986 F. Supp. 2d at 511 (emphasis added).  Based on that reading of Item 303, the District Court concluded that the securities plaintiffs stated a claim because, while Facebook disclosed the current trend of increased mobile usage and warned about its revenue impact, *see, e.g.*, *id.* at 510, Facebook was *also* required to disclose the "extent" to which that trend "was already" allegedly affecting Facebook's second quarter revenues, *see id.* at 511.  The *Securities Decision* likewise ruled

35

that mid-quarter revenue information could be material" without regard to whether it demonstrates an extreme departure, and thus trigger a disclosure duty under Rule 408. *Id.* at 522.

To start, the Rule 408 ruling was clear error because revenue impacts for interim or partial quarters are not material unless they show an extreme departure from the results for the last reported quarter. "[T]he materiality hurdle remains a meaningful pleading obstacle." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). In *DeMaria*, this Court affirmed that it was not "materially misleading," and thus not a violation of Rule 408, for the prospectus to "fail[] to include revenue information" for the most recently completed but unreported quarter when the complaint failed to allege facts supporting its conclusory allegation that the unreported quarter represented a "dramatic reversal" of revenue trends. 318 F.3d at 180-81. *DeMaria* again relied on *N2K*, which dismissed a Rule 408 claim, holding that information about a 5% increase in net losses during an unreported, completed quarter was not material because that was not "an 'extreme departure' from the range of anticipated results." 82 F. Supp. 2d at 207-08 (citation omitted).

36

The "extreme departure" standard is a "classic materiality issue" because it reflects that "[r]easonable investors understand that businesses fluctuate." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1210 (1st Cir. 1996). Thus, courts have recognized that even information from an unreported, *completed* quarter before an IPO is *not* "material" unless it constitutes an "extreme departure" from the reported information for prior quarters. *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.* 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001). It would be "unworkable and potentially misleading," and contrary to "[t]he disclosure structure set out by the SEC," to substitute "a system of instantaneous disclosure out [of] the normal reporting periods." *Id.*; *see Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) (a "system of periodic rather than continual disclosures" gives companies "the time necessary to get things right ... rather than jump the gun with half-formed stories as soon as a problem comes to their attention"). This very case demonstrates how a requirement of instantaneous disclosures—here, from a quarter still in progress— might be misleading. Facebook's revised prediction early in the second quarter that it would come in on the low end of its previous estimate of

37

$1.1-$1.2 billion *turned out to be wrong*.  The Company ultimately reported revenue at the high end of the original $1.1-1.2 billion range (*i.e.*, $1.184 billion).[10]

The District Court's ruling under Item 303 was equally erroneous because the mid-quarter information was just as immaterial for purposes of Item 303 as it was for Rule 408.  Prior to the *Securities Decision*, courts have applied the same "extreme departure" standard for immateriality under Item 303.  *Noah Educational Holdings* used the "extreme departure" standard in rejecting as "an end-run around the carefully delineated SEC regulations" plaintiffs' claim that the issuer violated "Item 303" by not disclosing an intra-quarter increase in raw material costs and the resulting reduction in profit margin.  2010 WL 1372709, at *6-7.  Likewise, *Focus Media* rejected a claim that under Item 303 declining gross margins in the quarter completed just weeks before a secondary offering were "material" when the company had "specifically articulated the *possibility* that [its] gross margin *could* fluctuate."  701 F. Supp. 2d at 543-44 (emphasis added).

---

[10]  *See supra* note 5.

Facebook did far more than warn that mobile use *could* affect future reported revenues. Facebook warned that "we do not *currently* directly generate any meaningful revenue from the use of Facebook mobile products," and that increased mobile usage "would" negatively affect "our financial performance and ability to grow revenue" if Facebook did not develop a successful monetization strategy. Final S-1 at 14; *see supra* at 7-8. Especially in light of these warnings, mobile's impact on Facebook's revenues in the first several weeks of the second quarter of 2012 certainly did *not* show an "'extreme departure' from the range of anticipated results," *In re N2K*, 82 F. Supp. 2d at 207-08, since Facebook's revised projections for the second quarter remained within the original range of projected *growth*. For fiscal year 2012, Facebook still projected substantial *growth*, but merely revised its full-year projections downward by at most 3.5%. Courts have held that even an *actual* revenue *decline* of 9% is not an "extreme departure." *Id.* at 208; *In re Turkcell,* 202 F. Supp. 2d at 12.

The District Court acknowledged that its *Securities Decision* was inconsistent with the prior Item 303 decisions in *Focus Media*, *Noah*, *N2K*, and *Turkcell*. *See Interlocutory Appeal Decision*, 986 F. Supp. 2d

39

at 541. But it asserted incorrectly that "*Litwin* and *Panther* overruled these cases *sub silentio*." *Id.* *Litwin* and *Panther* did no such thing, as neither case involved the materiality of a revenue impact that was from a partial quarter and that was less than an extreme departure.

In *Litwin*, the issuer allegedly failed to disclose that "in the *years* leading up to [its 2007] IPO," one of its portfolio companies was "writing insurance on collateralized debt obligations," and another had suffered "two years of manufacturing and production problems." 634 F.3d at 710-11. The issuer failed to disclose these trends at all, even though it "allegedly knew of, and reasonably expected, these problems to ... materially affect[] its future revenues." *Id.* at 710. *Litwin* had nothing to do with assessing the materiality of *mid-quarter* revenue information.

In *Panther*, the issuer learned from the full quarter before its IPO that there were defects in its computer chips that might require the return of "100% [of] all chips sold to clients representing 72% of revenues" and thus that "it had jeopardized its relationship with clients who at that time accounted for the vast majority of its revenues." 681 F.3d at 122. The holding in *Panther* that "a problem *of this magnitude*"

40

from a completed quarter was enough to allege materiality has no bearing whatsoever here, where Facebook's mid-quarter projections merely (and incorrectly) predicted slightly less revenue *growth* than originally projected. *Id.* at 120, 122 (emphasis added).

The *Securities Decision* erroneously reasoned that, because *Litwin* and *Panther* did not mention the "extreme departure" standard, those cases must have overruled *sub silentio* prior cases holding that intra-quarter revenue information need not be disclosed absent an extreme departure. *See Interlocutory Appeal Decision*, 986 F. Supp. 2d at 541-42. But *Litwin* did not involve intra-quarter information at all, and therefore had no reason to mention the extreme departure standard. And *Panther did* focus on the "magnitude" of the event in question—a threatened recall of products representing 72% of the company's revenue. Because both cases are fully consistent with the extreme departure standard, their failure to mention it does not imply a silent reversal of precedent.

Moreover, after *Litwin* and *Panther*, this Court in *Arfa v. Mecox Lane Ltd.*, 504 F. App'x 14 (2d Cir. 2012), affirmed the dismissal of Item 303 and Rule 408 claims indistinguishable from those here. Appellants

in *Arfa* cited both *Litwin* and *Panther* to argue that Item 303 and Rule 408 required the Registration Statement to disclose "third and fourth quarter 2010 *data*, which showed increased online sales and decreased directly-operated store sales." *Arfa*, 504 F. App'x at 16 (emphasis added). Although this Court agreed that these quarterly data reflected "trends a reasonable registrant would expect to materially impact on net sales, revenue, or income," it held: "[T]he third and fourth quarter *data* were not material to those trends, because the Registration Statement already disclosed those trends" themselves. *Id.* (emphasis added).

*Arfa* is indistinguishable because, as the *Securities Decision* acknowledged, Facebook's Registration Statement disclosed the "trend" of "the increase of mobile users" and warned about the trend's potential revenue impact. *Securities Decision,* 986 F. Supp. 2d at 510-11. Most important, *Arfa* contradicts the *Securities Decision*'s core holding that issuers must not only disclose material trends and warn about their potential revenue impact, they must also disclose "the extent" that the trends were "already affecting [the issuer's] revenues," *Securities*

42

*Decision*, 986 F. Supp. 2d at 512, even when the effect occurred during an unreported partial quarter and did not show an extreme departure.

> c.    The *Securities Decision* Properly Rejected Crocitto's Claim That Selective Disclosures Of Pre-IPO Projections Are Unlawful.

Finally, Crocitto claims the directors are susceptible to liability for "fail[ing] to disclose internal projections" publicly while "*selectively* disclos[ing] internal projections to the lucky few." Opening Br. 17 (emphasis in original). But the *Securities Decision* actually (and properly) rejected these claims, reaffirming that "[i]nternal forecasts are generally considered 'not material facts that are require[d] to be disclosed in a registration statement.'" *Securities Decision*, 986 F. Supp. 2d at 507 (quoting *Deriv. Op. I*, 922 F. Supp. 2d at 472) (collecting cases). The *Securities Decision* also agreed with cases holding that alleged selective disclosures of projections do not trigger a duty to print that information in a registration statement. *Id.* at 507, 513 ("Facebook's choice to make [calls] to a select group of investors just a few days before its IPO [disclosing its projections] does not, by itself, trigger" a duty to disclose those projections to the public); *see also, e.g.*, *Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1052 (9th Cir.

43

1993) (declining "to adopt a 'whole truth' exception in cases such as this where a corporation has disclosed internal projections outside the confines of the company, but not to the public generally"); *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 n.20 (1st Cir. 1996) ("That internal forecasts are disclosed to underwriters does not make them any more susceptible to a duty to disclose to the investing public."). Indeed, although the SEC's Regulation FD usually requires that "the issuer shall make public disclosure of [material nonpublic] information" that it discloses to any person, 17 C.F.R. § 243.100(a), the SEC has *rejected* calls to extend this rule to projections shared with underwriters and institutional investors in connection with an IPO. *See Securities Offering Reform*, 70 Fed. Reg. 44722, 44739, 44760 (Aug. 3, 2005); *Selective Disclosure and Insider Trading*, 65 Fed. Reg. 51716, 51719 (Aug. 24, 2000).

### B. The District Court Did Not Abuse Its Discretion In Finding Inadequate Crocitto's Allegations That Directors Lacked Independence.

Crocitto also argues that three directors were "subject to extraneous considerations" or "financially beholden" to an interested director, Opening Br. 10, 12-13, 14-15, and therefore lacked

44

independence.  The District Court did not abuse its discretion in finding no "plead[ed] facts that would support the inference" that any director is "so 'beholden' to an interested director," he or she would be "willing to risk [their] reputation" by ignoring their obligation to act independently.  *Beam*, 845 A.2d at 1048-52.

*Andreessen*:    Crocitto's theory that Andreessen is beholden to Zuckerberg because he "does considerable business with Facebook and reaped $78 million on one deal alone," Opening Br. 15, is deficient as a matter of law.  In the first place, any alleged influence Zuckerberg might have is irrelevant given that Crocitto has not adequately alleged that Zuckerberg is himself interested, *see Deriv. Op. I*, 922 F. Supp. 2d at 470, and that "even proof of majority ownership of a company does not strip the directors of the presumptions of independence." *Aronson*, 473 A.2d at 815; *see also Beam*, 845 A.2d at 1054.  Moreover, "a plaintiff must plead facts that would support the inference that because of the nature of a relationship ... the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Beam*, 845 A.2d at 1052; *see id.* at 1050 (only relationships that "border on or even exceed familial loyalty and

closeness[] may raise a reasonable doubt whether a director can appropriately consider demand").

Particularly given Mr. Andreessen's vast success as co-founder of his own venture capital firm, JA147 (Am. Compl. ¶15), the District Court did not abuse its discretion in rejecting suggestions that Andreessen's prior business relations with Facebook overcome his independence. *Deriv. Op. I*, 922 F. Supp. 2d at 470-71; *see also In re Goldman Sachs Group, Inc. S'holder Litig.*, 2011 WL 4826104, at *9 (Del. Ch. 2011) (allegation that Goldman invested $670 million in funds managed by a Goldman director was insufficient without a showing that the director "relies on the management of these funds for his livelihood").

*Bowles*:  Crocitto insists that Bowles is not independent because he sits on the Board of Morgan Stanley, whose conduct as lead underwriter of the Facebook IPO is implicitly challenged.  Opening Br. 14-15.  Before Crocitto can show that Bowles is beholden to Morgan Stanley, however, he must first show that Morgan Stanley is in fact interested in this case.  *See Desimone*, 924 A.2d at 928.  Mere allegations of misconduct do not create a disqualifying interest.  *See,*

46

*e.g.*, *Citigroup*, 964 A.2d at 121; *Hesse*, 962 F. Supp. 2d at 585 (collecting cases). Instead, Crocitto must show that Morgan Stanley faces a "substantial likelihood" of liability if the suit goes forward. *See Seminaris*, 662 A.2d at 1354. Crocitto's failure to show a "substantial likelihood" of liability, *see supra* Section I.A, applies with respect to Morgan Stanley as well.

In any event, even if Morgan Stanley were interested, Crocitto failed to rebut the presumption that Bowles is able to independently consider taking action against a company with which he is affiliated. *See, e.g.*, *Jacobs v. Yang*, 2004 WL 1728521, at *5-6 (Del. Ch. 2004), *aff'd*, 867 A.2d 902 (Del. 2005). This presumption is especially strong for directors who have successful independent careers, *Beam*, 845 A.2d at 1052 & n.31—a group that certainly includes Bowles who has served as the White House Chief of Staff, the President of the University of North Carolina, and as a director of several major corporations, JA147 (Am. Compl. ¶16). Rebutting that presumption would require "particularized facts" demonstrating how the relationship "influenced [the director's] decision-making." *In re Goldman Sachs*, 2011 WL 4826104, at *9. But Crocitto offers no facts suggesting that Bowles

47

would risk his reputation to protect Morgan Stanley's relationship with Facebook. He alleges no material equity interest in Morgan Stanley, or dependence on Morgan Stanley for Bowles's livelihood. *See In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 602 (S.D.N.Y. 2007). Crocitto does not even allege that Bowles' responsibilities at Morgan Stanley include maintaining relations with Facebook, *see id*; *Khanna v. McMinn*, 2006 WL 1388744, at *17 (Del. Ch. 2006), nor that Bowles has ever made a decision in his capacity as a Facebook director that was influenced by any allegiance to Morgan Stanley. *See Aronson*, 471 A.2d at 816. Finally, Crocitto does not suggest that Zuckerberg or anyone else ever threatened to sever relations with Morgan Stanley, or has otherwise used Facebook's relationship with Morgan Stanley to control Bowles. *See Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Without such particularized allegations, the District Court properly found no basis to assume implausibly that Bowles is under Zuckerberg's control. *Deriv. Op. I*, 922 F. Supp. 2d at 471; *Deriv. Op. II*, 2013 WL 6798160, at *20.

48

*Sandberg*:    Crocitto claims that Sandberg is controlled by Zuckerberg because Zuckerberg is "CEO, Chairman of the Board, and controlling stockholder" and "can discharge Director Sandberg at any time."  Opening Br. 12.  But Sandberg does not "lose [her] ability to exercise independent business judgment merely by virtue of [her] being [an] officer[]" in a company controlled by Zuckerberg.  *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 357 (Del. Ch. 1998), *aff'd in relevant part*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Were it so, "every inside director would be disabled from considering a pre-suit demand," contrary to Delaware law's strong presumption of independence.  *In re Sagent Tech., Inc.*, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003).  Instead, Crocitto had to plead specific facts showing that Sandberg's Facebook benefits are "of such subjective material importance" to her that their "threatened loss might create a reason to question whether the director is able to consider the corporate merits of the [demand] objectively."  *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002).  Crocitto's complaint is devoid of any such allegations, perhaps because Ms. Sandberg's success as a best-selling author and executive outside

49

Facebook render them implausible.  The District Court did not abuse its discretion in so concluding.  *Deriv. Op. II*, 2013 WL 6798160, at *20.

## II.    Crocitto Did Not Adequately Allege Contemporaneous Share Ownership.

Separate and apart from the failure to make a demand, the District Court properly dismissed on the grounds that Crocitto was "not [an] actual or equitable owner[] of Facebook stock at the time of the alleged transgression" and therefore "lack[s] standing to bring [his] derivative claim."  *Deriv. Op. II*, 2013 WL 6798160, at *16.  Rule 23.1 requires the complaint to "allege that the plaintiff was a shareholder … at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law."  Fed. R. Civ. P. 23.1(b)(1); *accord* Del. Code tit. 8, § 327 (requiring the same).[11]  This contemporaneous ownership requirement "denies a derivative plaintiff standing to challenge transactions that occurred prior to the time the plaintiff became a shareholder."  *Ensign Corp. v. Interlogic Trace, Inc.*, 1990 WL 213085, at *2 (S.D.N.Y. 1990).

---

[11]  Crocitto has not argued below or on appeal that he has standing under the "operation of law" exception.  That argument accordingly is waived.

50

The crux of Crocitto's complaint is that Facebook's directors failed to prevent information from being "misrepresented or omitted in Facebook's SEC filings leading up to [Facebook's] IPO." JA144 (Am. Compl. ¶2). To have standing for such a claim, Crocitto must allege that he owned Facebook shares when the SEC filings in question were made. As multiple courts have held, acquiring company shares *after* an IPO does not establish standing. *See Deriv. Op. I*, 922 F. Supp. 2d at 464-65; *Griggs v. Jornayvaz*, 2010 WL 4932674, at *3-4 (D. Colo. 2010) ("plaintiffs cannot base any of their claims on transactions that took place prior to" the date stock was publically traded); *Lefort v. Black*, 2003 WL 1563997, at *1 (N.D. Cal. 2003) (acquirer of company shares shortly after IPO lacked standing to derivatively sue directors for underpricing shares in the IPO).

Crocitto admitted he did not own Facebook shares when the SEC filings leading up to Facebook's IPO were made. JA146 (Am. Compl. ¶10). Instead, he "beneficially purchase[d] [] Series 2 Membership Units of SharesPost Private Investments II, LLC," which "converted into Class B Common Stock of Facebook [six months] *after the IPO*." *Id.* (emphasis added). A "Series 2 Membership Unit[] of SharesPost

51

Private Investments II, LLC," however, is not a share of Facebook stock, and, as the District Court correctly held, does not enable a plaintiff to sue derivatively on Facebook's behalf.

### A.    As Crocitto Admitted, He Did Not Own Facebook Stock At The Time Of The IPO.

SharesPost "Units" were not Facebook stock, but interests in a separate corporation called "SharesPost Private Investments II, LLC" ("SharesPost LLC").  *Id.*  SharesPost LLC was the holder of Facebook stock, which it eventually chose to distribute to Crocitto on November 16, 2012—six months after Facebook's IPO.  JA261 (SharesPost email). The agreements governing Crocitto's relationship with SharesPost LLC make clear that at the time of the SEC filings he "ha[d] *no direct interest* in any Facebook Securities, and that Facebook Securities [we]re held solely by [SharesPost LLC]."  JA219 (Subscription Agmt. § 3(m)) (emphasis added).[12]

Crocitto argues based upon *Plymouth County Retirement Association v. Schroeder*, 576 F. Supp. 2d 360, 374 (E.D.N.Y. 2008), that "merely employ[ing] the language of the rule has been held sufficient to

---

[12] Courts may consider materials attached to or incorporated by reference into a complaint.  *See Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir. 1998).

sustain the complaint against a motion to dismiss." Opening Br. 20. The law is clear that "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). In any event, Crocitto did not "employ[] the language" of Rule 23.1. Rather, he alleged that until six months after the IPO he owned only units of SharesPost LLC. The District Court correctly held that a derivative plaintiff lacks standing where he admits that he himself did not own stock at the time of the challenged conduct. *Deriv. Op. II*, 2013 WL 6798160, at *14-15. *Cf. In re Aozora Bank Ltd. v. SIPC*, 480 B.R. 117, 128 (S.D.N.Y. 2012) (holding that investors in a fund "were buying ownership shares of the [] Funds, and thus had no property interest in any of the [] Funds' assets."), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013).[13]

---

[13] Similarly misplaced is Crocitto's argument that the District Court found his ownership allegations insufficient only by requiring heightened pleading. The District Court stated the correct pleading standard in the section of *Derivative Opinion II* entitled "Applicable Standards." 2013 WL 6798160, at *13 ("[A] shareholder's derivative complaint must *allege* that the 'plaintiff was a shareholder or member at the time of the transaction complained of.'") (quoting Fed. R. Civ. P. 23.1) (emphasis added). While the District Court later mentioned in passing "both the *Twombly* standards and the heightened pleading standards of Rule 23.1," it did not rely on a lack of particularized allegations. Rather, the District Court found that

**B.    The District Court Correctly Rejected Crocitto's Equitable Ownership Claim.**

The District Court also correctly rejected Crocitto's claim to be an "equitable" owner of Facebook stock.  *Deriv. Op. II*, 2013 WL 6798160, at *14-15.  Equitable ownership is a limited exception to the normal requirement that only actual stockholders have contemporaneous ownership of the company's shares.  It was initially applied to allow individuals holding company shares in "street name" through brokerage accounts to bring derivative suits.  *See Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 113 (Del. Ch. 1948) (cited in Opening Br. 22 n.9).  It would be a far cry from this beginning, however, to say that Crocitto's interest in SharesPost made him an equitable owner of Facebook stock.

Crocitto claims equitable ownership because his "interest in SharesPost was 'associated exclusively with the Facebook Securities to be purchased with the proceeds of the Company's sale of its Series 2

---

an admission that a plaintiff owned only units of SharesPost funds at the time of the IPO, rendered allegations of owning Facebook stock *implausible. See id.* at *13-15.  This is a *Twombly* ruling, not a particularity ruling.  *See Smith v. Stevens*, 957 F. Supp. 2d 466, 470 (S.D.N.Y. 2013) ("*Twombly's* . . . requirement . . . entails that a derivative plaintiff plead a *plausible* allegation of share ownership throughout the period of alleged misconduct.") (emphasis in original). Here, Crocitto plainly alleged pre-IPO ownership of units of SharesPost funds, not Facebook stock.  JA146 (Am. Compl. ¶10 ).

Membership Units.'"   Opening Br. 23 (citing JA175 (Subscription Agreement § 3(f)).  But mere "associat[ion]" with Facebook stock is not enough.   Options and convertible debentures, for example, are "associated" with the securities to which they relate, but do not confer derivative standing.  *See, e.g.*, *Harff v. Kerkorian*, 324 A.2d 215, 220 (Del. Ch. 1974) (owning convertible bonds or stock options does not make one "an equitable stockholder of the corporation" until "the conversion occurs"), *aff'd in relevant part, rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975); *Gamble v. Penn Valley Crude Oil Corp.*, 104 A.2d 257, 260 (Del. Ch. 1954) (same).

Likewise, "[a]greeing to purchase stock does not make one a stockholder, especially if the stock will not even be issued until the consummation of the challenged series of actions."  *In re Nine Sys. Corp. S'holders' Litig.*, 2013 WL 771897, at *8 (Del. Ch. 2013); *see also Helvering v. Sw. Consol. Corp.*, 315 U.S. 194, 200-01 (1942) (one "does not become a stockholder, by his contract, in equity any more than at law") (internal quotations omitted); *In re New Valley Corp. Deriv. Litig.*, 2004 WL 1700530, at *6 (Del. Ch. 2004) (contracts to acquire stock at a future date "do not confer an interest that may be said to satisfy the

55

continuous ownership requirement"); *Simons v. Cogan*, 549 A.2d 300, 303 (Del. 1988) (a contractual entitlement to stock "does not represent an equitable interest in the issuing corporation"); *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1172 (Del. 1988) ("interests held by [] prospective stockholders were insufficient to impose fiduciary obligations").

The SharesPost contracts do not even purport to give Crocitto any of the rights of a Facebook shareholder. They plainly state that he had "*no direct interest in any Facebook securities*" before the IPO and that there was no guarantee Crocitto would ever receive Facebook stock. JA219 (Subscription Agmt. § 3(m)) (emphasis added). Specifically, the SharesPost Operating Agreement prohibited any pre-IPO transfer of Facebook securities. JA223 (Subscription Agmt. § 5), JA247-48 (Operating Agmt. § 8.1). They did not allow distribution of Facebook shares unless and until the issuer experiences a liquidity event like an IPO and the "expiration of any transfer restrictions." JA196 (Operating Agmt. § 4.2(b)). It is ironic, to say the least, that Crocitto would like to pursue complaints about how the IPO was conducted, given that the occurrence of the IPO—which was far from inevitable—made it possible

56

(but not required) for SharesPost to consider transferring him shares six months after the IPO. The six month "waiting" period for any transfer was central to the SharesPost agreement and was necessary to assure compliance with federal securities laws' prohibitions against selling unregistered securities to certain persons. *See* 15 U.S.C. § 77e; *see also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008).

Critically, the Operating Agreement also made clear that the SharesPost "Manager" "in its sole discretion shall have the right, *but not the obligation*, to distribute Issuer Securities, *Available Cash, or other Company Property to the Members*." JA196, JA237 (Operating Agmt. § 4.2(a) (emphasis added)). The SharesPost entity could also require investors to withdraw their investments before any distribution was made, "with or without cause," JA207, JA248 (Operating Agmt. § 8.8), and SharesPost investors could withdraw invested capital with the Manager's consent. JA207, JA248 (Operating Agmt. § 8.7). Assuming no withdrawal occurred, and assuming an IPO occurred and transfer restrictions expired, even then, SharesPost had discretion to

convey cash rather than securities.  The Operating Agreement provides that "[e]ach [] distribution shall be made, *according to the discretion of the Manager*, in the form of (i) all of the Issuer Securities, (ii) *Available Cash* from the Company's sale of all the Issuer Securities, or (iii) any combination of (i) and (ii)."  JA196, JA238 (Operating Agmt. § 4.2(b)) (emphasis added).  In other words, Crocitto might have ended up with nothing more than a cash return on his investment, and thus Crocitto's eventual interest in Facebook stock was hardly "irrevocable" as he now claims.  Opening Br. 24; *cf. Harff*, 324 A.2d at 220 (owning convertible bonds or stock options does not make one "an equitable stockholder of the corporation" until "the conversion occurs").

The cases Crocitto cites, *Pennington v. Neukomm*, 1973 WL 463 (Del. Ch. 1973), *aff'd without op.*, 344 A.2d 386 (Table) (Del. 1975), and *Jones v. Taylor*, 348 A.2d 188 (Del. Ch. 1975), do not support his position.  Both involved interests that, unlike those here, were traditionally enforced in equity: in *Jones v. Taylor*, 348 A.2d at 191, "a contract to make a will" created "an equitable interest in the specific property to be bequeathed," and in *Pennington*, 1973 WL 463, at *2, a contract between a husband and wife created rights enforceable in

58

equity. *Pennington* involved a divorce agreement promising the ex-wife half of the ex-husband's stock in a company after a defined term. The ex-husband diverted company assets into a new company to evade this agreement, causing the ex-wife to sue as a derivative shareholder of that company. The court held that she had standing because "under the terms of the agreement" she had "already purchased the stock by entering into the separation and property settlement agreement," "whether or not she actually receives the shares is not left to her discretion," and "[the ex-husband] is obligated to eventually deliver it to her," if he still held it. *Id.* at *3. Similarly, in *Jones v. Taylor*, the court held that an individual had equitable ownership of stock where she and her mother contracted that the mother must bequeath the stock; "[h]er mother's death, though uncertain as to date, was an inevitable event and plaintiff's interest was enforceable after her mother's death." 348 A.2d at 192.

As other courts have noted, "*Pennington* and *Jones* were decisions relying in large part on contract language," and they "both involved situations where the plaintiff had already given consideration for stock; no intermediate step was necessary *and* there was no 'convertibility'

59

feature." *In re New Valley Corp. Deriv. Litig.*, 2004 WL 1700530, at *6 (Del. Ch. 2004) (emphasis added). In both cases, the plaintiffs had an enforceable interest in company shares—in *Pennington*, a contract between husband and wife *required* the husband to transfer the stock if he still owned it after six years, and in *Jones v. Taylor*, the mother's trustee was required to transfer the stock upon the "inevitable" death of the mother if it had not been sold. 1973 WL 463, at *2. In contrast, the Subscription Agreement here plainly does not involve a Facebook stock interest that would be enforced in equity. It gives Crocitto "no direct interest" in Facebook stock, JA219 (Subscription Agmt. § 3(m)); it makes any transfer of Facebook stock contingent on an event like the IPO that was not "inevitable," JA196 (Operating Agmt. § 4.2(b); and it makes clear that SharesPost could always transfer cash instead of Facebook stock to Crocitto, JA196, JA238 (Operating Agmt.§ 4.2(b)). Crocitto thus falls outside the limited exception recognized in *Pennington* and *Jones v. Taylor*.

Crocitto contends that finding him to be "an equitable owner of Facebook stock prior to the IPO would not frustrate ... [the] purpose" of the contemporaneous ownership rule because he did not invest in

60

SharesPost solely for the purpose of buying a lawsuit. Opening Br. 23. But neither Rule 23.1 nor Delaware's analogue "include any provision exempting 'good faith' purchasers from its terms," and courts have consistently refused "to ignore the clear language of the statute." *7547 Partners v. Beck*, 682 A.2d 160, 163 (Del. 1996). Moreover, "the policy behind the [contemporaneous ownership] rule is not solely to prevent strike suits," but extends more broadly to anyone who would invoke the extraordinary procedure of a derivative suit to address alleged wrongs that occurred before they were owners of the corporation. *In re New Valley*, 2004 WL 1700530, at *6.

Pre-IPO holders of Facebook stock, *i.e.*, those who held Facebook stock prior to the May 18, 2012 IPO, including SharesPost, could have brought suit but did not. *Cf. Jones v. Taylor*, 348 A.2d at 192 (allowing plaintiff to maintain suit based "also upon considerations of fairness … [because] the individual defendants who are the only other shareholders will not bring suit against themselves"). Crocitto is thus complaining about an IPO that the existing shareholders benefited from and have not challenged. Crocitto is no substitute because he was not "a

61

shareholder ... at the time of the transaction complained of."  Fed. R. Civ. P. 23.1(b)(1).

## III.  Crocitto's Claims Are Not Ripe.

Because Crocitto's claims are contingent on the resolution of the Securities Action, the District Court correctly dismissed them as unripe.

### A.  There Is No Requirement That A Court Only Consider Constitutional Ripeness.

Crocitto contends that the District Court purported to dismiss for lack of constitutional ripeness, but in fact it relied on "exclusively prudential [ripeness] considerations."  Opening Br. 26.

Crocitto recognizes that the two ripeness doctrines are intertwined and use "*overlapping* threshold criteria for the exercise of a federal court's jurisdiction."   Opening Br. 25 (emphasis added). Constitutional ripeness requires actual or imminent injury because an injury that is "'merely speculative and may never occur'" does not present an Article III case or controversy.  *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (citation omitted).  Prudential ripeness likewise recognizes that there may be reasons that "[a constitutionally ripe] case will be better decided later,'" and that the court should "'avoid becoming embroiled in

62

adjudications that may later turn out to be unnecessary." *Id.* (citation omitted). Thus, as this Court has held, the "two-step inquiry" that the District Court performed—evaluating "'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration'"—"is relevant for both constitutional and prudential ripeness analysis." *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131-32 & n.9 (2d Cir. 2008) (citations omitted); *see also Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003) (prudential ripeness "questions are also relevant to the constitutional ripeness determination"). So the District Court did not merely consider prudential ripeness factors; it also considered constitutional ripeness factors.

But it would not matter if the District Court considered only prudential ripeness, because this Court routinely affirms dismissals on *either* constitutional or prudential ripeness grounds. *See*, *e.g.*, *Grandeau*, 528 F.3d at 135 (affirming only "under our prudential ripeness doctrine"); *see also Simmonds*, 326 F.3d at 359 (finding claims constitutionally ripe but prudentially unripe); *Am. Savs. Bank, FSB v. UBS Fin. Servs. Inc.*, 347 F.3d 436, 439-40 (2d Cir. 2003) (dismissing appeal solely on the basis of prudential ripeness). "[A] determination

63

that a case is not 'ripe,' under either doctrine, results in dismissal, either for lack of jurisdiction or pursuant to a refusal to exercise jurisdiction." *Simmonds*, 326 F.3d at 357 (citations omitted). Here, Crocitto has not even argued that his claims are prudentially ripe and has thereby waived any such contention. *See, e.g.*, *JP Morgan Chase Bank v. Altos Hornos de Mex.*, *S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("arguments not made in an appellant's opening brief are waived"). Because it is undisputed in this Court that Crocitto's claims are prudentially unripe, any alleged error in using the label of constitutional unripeness is of no consequence as this Court is "free to affirm on any legal basis for which there is sufficient support in the record." *United States v. Catoggio*, 698 F.3d 64, 68 n.3 (2d Cir. 2012).

**B.    Crocitto's Claims Are Not Ripe.**

In all events, the hypothetical injuries to Facebook that Crocitto alleged—(1) potential liability in the federal securities class action, JA144-145, 151, 155-158, 161 (Am. Compl. ¶¶4, 28, 46, 49, 50, 60); (2) cost of defending against lawsuits and government investigations, JA144, 158 (Am. Compl.¶¶ 3, 50); and (3) increased cost of capital and reputational harm, JA144, 155, 158 (Am. Compl. ¶¶3, 46, 51, 52)—were

neither constitutionally nor prudentially ripe. All of these alleged injuries remain unripe, unless and until Facebook's liability is established in the Securities Action. *See*, *e.g.*, *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1098, 1106 (2d Cir. 1988) (dismissing injury as "premature" and "speculative" when it depends on outcome of another proceeding); *see also In re Symbol Techs. Sec. Litig.*, 762 F. Supp. 510, 516-17 (E.D.N.Y. 1991) (dismissing case that "hinge[d] entirely on the outcome of another pending action").

The alleged harm of liability in the Securities Action will not be ripe unless and until Facebook is found liable. Crocitto's attempt to portray the outcome of the Securities Action as a foregone conclusion simply because the District Court denied the motion to dismiss, JA144-45, 161 (Am. Compl. ¶¶4, 60); Opening Br. 13, is misguided. *See In re United Telecomms., Inc., Sec. Litig.*, 1993 WL 100202, at *1, *3 (D. Kan. 1993) (dismissing derivative action as unripe where securities class action containing similar allegations survived motion to dismiss). The District Court rejected many of the securities plaintiffs' theories, after all. *See supra* Section I.A.2.c. And it recognized that the surviving legal theories conflicted with other precedents. *See id.* at Section I.A.2.a

65

- I.A.2.b.  Moreover, those surviving theories are wrong, *supra id.*, and the *Securities Decision* is subject to modification and reversal "at any time."  Fed. R. Civ. P. 54(b).  Even under the *Securities Decision* as is, liability issues such as omission, falsity, materiality, and causation will not be decided until after factual development, appropriate discovery, expert reports, and ultimately trial.  *Securities Decision*, 986 F. Supp. 2d at 514, 519, 522-23.  The *Securities Decision* thus differs from the situation in *MTBE*, *see* Opening Br. 25-26, 28, where the only issue was "the scope of the *damages* flowing from [an] injury" that defendant had conceded its wrong had caused.  725 F.3d at 110.  Here, without adjudication of Facebook's liability in the Securities Action, there is no ripe injury.  *See*, *e.g.*, *Falkenberg v. Baldwin*, 1977 WL 1025, at *4 (S.D.N.Y. 1977); *United Telecomms.*, 1993 WL 100202, at *3.

Likewise, Crocitto's other allegations—that individual defendants' conduct wrongfully caused defense and investigation costs, increased Facebook's cost of capital, and harmed Facebook's reputation—are equally unripe because whether any such harms can be traced to *wrongful* conduct remains to be decided.  Derivative claims are not ripe merely because a company defends *allegations* of wrongdoing in a

66

securities case. *See*, *e.g.*, *In re Cray, Inc.*, 431 F. Supp. 2d 1114, 1134 (W.D. Wash. 2006); *see also Falkenberg*, 1977 WL 1025, at *4. For such ripeness, "damages must be shown to flow directly from the wrongful acts of defendants, and not to the mere commencement of legal proceedings" that may lack merit. *In re Symbol*, 762 F. Supp. at 517; *accord United Telecomms.*, 1993 WL 100202, at *3.[14]

Crocitto's allegations of increased capital costs and reputational harm were also entirely contingent and speculative. Crocitto's April 2014 complaint identified no attempt by Facebook to raise capital after the IPO, much less any higher cost for capital. Nor does it allege that a single Facebook user or advertiser has been put off by Facebook's "reputation." Instead, Crocitto quoted a May 2012 Slate.com posting,

---

[14] Crocitto's cases are off-point. In *United States v. Fell*, 360 F.3d 135, 139-40 (2d Cir. 2004), a criminal defendant's pretrial challenge to the Federal Death Penalty Act was ripe because that Act impacted his current decisions about trial strategy. Here, by contrast, no decision or action is required of Crocitto at this time. *Sonkin v. Barker*, and *In re Cendant Corp. Deriv. Action Litig.*, Opening Br. 29, did not involve *ongoing* litigation. *See Sonkin*, 670 F. Supp. 249, 252-53 (S.D. Ind. 1987) (defendants' $2.7 billion settlement "render[ed] moot the defendants' argument that the plaintiffs' claims are contingent on losses that have not yet been incurred"); *In re Cendant*, 189 F.R.D. 117, 135 (D.N.J. 1999) ("Cendant has already incurred legal expenses and issued almost $350 million in securities to settle the Prides litigation.").

67

opining generally that Facebook "risks being synonymous with Wall Street money-grubbing." JA158 (Am. Compl. ¶51). The District Court correctly found that such "speculat[ion] as to potential risks," *Deriv. Op. I*, 922 F. Supp. 2d at 474, is plainly not ripe. *See In re Cray*, 431 F. Supp. 2d at 1134 ("lost goodwill and business reputation damage allegations must be more than speculative and conclusory"); *United Telecomms.*, 1993 WL 100202, at *2 (dismissing "conclusory" assertions of reputational damage and increased capital costs). This speculation is implausible given Facebook's widely-reported success in the years since the IPO. *See* Reed Albergotti, *Facebook Answers Critics With Mobile Surge*, WALL ST. J., July 23, 2014, at A1 (Facebook's stock has "nearly double[d] Facebook's initial public offering price of $38").

Finally, Crocitto cannot establish ripeness by pointing to injuries not alleged in his complaint. His complaint makes no mention of "disgorgement of corporate profits," "loss of improper underwriting fees and financial benefits," or "costs associated with avoiding future litigation and regulatory damages." *Compare* JA158 (Am. Compl. ¶¶50-52), *with* Opening Br. 27. Accordingly, these alleged injuries should not

68

be permitted as a basis for appeal. *See, e.g., N.Y. City Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 67 n.2 (2d Cir. 1999).

In any event, as discussed further in the *Jones* appeal, *see Jones* Response Br. Section IV, these newly-asserted injuries are themselves unripe. They too depend either on the outcome of the Securities Action, which must address whether Facebook or underwriters did anything wrongful,[15] or on other "*future* litigation and regulatory damages," Opening Br. 27 (emphasis added), that are patently conjectural and, therefore, do not amount to "an 'injury in fact.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Indeed, the hypothetical nature of those supposed injuries is underscored by the fact that "[i]n May 2014,

---

[15] As the District Court held, *see Deriv. Op. II*, 2013 WL 6798160, at *23, the National Securities Markets Improvement Act of 1996 renders unripe derivative disgorgement claims for insider selling in the IPO. *See* Jones Response Br. Section IV. Crocitto does not mention—much less challenge—the District Court's NSMIA ruling. He has thus "forfeited any objection" to this holding. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 130 (2d Cir. 2013) (citation omitted); *see also Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 91 (2d Cir. 2014) (failure to "dispute or even mention the district court's" ruling constitutes waiver).

the [SEC] notified [Facebook] that it had terminated its inquiry and

that no enforcement action had been recommended by the SEC."[16]

## CONCLUSION

This Court should affirm the judgment below.

October 10, 2014                                  Respectfully submitted,

                                                  */s/ Andrew B. Clubok*

Susan E. Engel                                    Andrew B. Clubok
Kellen S. Dwyer                                   Brant W. Bishop, P.C.
KIRKLAND & ELLIS LLP                              KIRKLAND & ELLIS LLP
655 Fifteenth St. NW                              601 Lexington Avenue
Washington, DC 20005                              New York, NY 10022
Telephone: (202) 879-5000                         Telephone: (212) 446-4800
Facsimile: (202) 879-5200                         Facsimile: (212) 446-4900


Richard D. Bernstein                              Tariq Mundiya
Elizabeth J. Bower                                Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP                       Sameer Advani
1875 K Street, NW                                 WILLKIE FARR & GALLAGHER LLP
Washington, DC 20006                              787 Seventh Avenue
Telephone: (202) 303-1000                         New York, NY 10019-6099
Facsimile: (202) 303-2000                         Telephone: (212) 728-8000
                                                  Facsimile: (212) 728-8111

*Counsel for Defendants-Appellees*

---

[16] *See* Facebook Form 10-Q Disclosure, at 17, 35 (July 24, 2014),
http://www.sec.gov/Archives/edgar/data/1326801/00013268011400003
2/fb-6302014x10q.htm.  While Crocitto points to investigations by
Massachusetts and FINRA, there is no allegation that those
regulators pursued an investigation of Facebook or its disclosures, as
opposed to other entities, such as NASDAQ.  *See* Whitney Kisling,
*Nasdaq Payout on Facebook is $41.6 Million After Finra Review*,
Bloomberg (Oct. 25. 2013).

70

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

I certify that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 13,946 words, as authorized by Rule 32.

_/s/ Andrew B. Clubok_

Andrew B. Clubok
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

_Counsel for Defendants-Appellees_

## CERTIFICATE OF DIGITAL-SUBMISSION COMPLIANCE

I hereby certify that:

(1) all required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk; and

(2) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (McAfee Enterprise 8.5 Virus Scan, updated as of August 16, 2013) and, according to the program, are free of viruses.

*/s/ Andrew B. Clubok*
_____

Andrew B. Clubok
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

Pursuant to this Court's Rule 25.1(h), I hereby certify that the foregoing brief was served electronically through the CM/ECF system upon all counsel of record in this action.


*/s/ Andrew B. Clubok*
*Counsel for Defendants-Appellees*